FILED
United States Court of Appeals
Tenth Circuit

August 20, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MICHEAL BACA; POLLY BACA; ROBERT NEMANICH,

Plaintiffs - Appellants,

v.

COLORADO DEPARTMENT OF STATE,

Defendant - Appellee.

------------------------------

INDEPENDENCE INSTITUTE; DAVID G. POST; DEREK T. MULLER; MICHAEL L. ROSIN; ROBERT M. HARDAWAY, Professor of Law, University of Denver Sturm College of Law; COLORADO REPUBLICAN COMMITTEE,

Amici Curiae.

No. 18-1173

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-01937-WYD-NYW)**

---

Jason Harrow, Equal Citizens, Cambridge, Massachusetts (Jason B. Wesoky, Hamilton Defenders, Denver, Colorado, and Lawrence Lessig, Equal Citizens, Cambridge, Massachusetts, with him on the briefs), for Plaintiff – Appellants.

Grant T. Sullivan, Assistant Solicitor General (Cynthia H. Coffman, Attorney General; Frederick R. Yarger, Solicitor General; LeeAnn Morrill, First Assistant Attorney

General; Matthew Grove, Assistant Solicitor General, with him on the brief), for Appellee Colorado Department of State, Denver, Colorado.

Michael Donofrio, Donofrio Asay PLC, Montpelier, Vermont, and Aaron Solomon, Hale Westfall, LLP, Denver, Colorado, filed an amicus brief on behalf of Michael L. Rosin and David G. Post.

David B. Kopel, Independence Institute, Denver, Colorado, filed an amicus brief on behalf of Independence Institute.

Michael Francisco, Statecraft, PLLC, Colorado Springs, Colorado, and Derek T. Muller, Associate Professor of Law, Pepperdine University Law School, Malibu, California, filed an amicus brief on behalf of Derek T. Muller.

Jeffrey S. Hurd, Bernard A. Buescher, William A. Hobbs, Ireland Stapleton Pryor & Pascoe, P.C., Denver, Colorado, and Robert M. Hardaway, Professor of Law, University of Denver, Sturm College of Law, Denver, Colorado, filed an amicus brief on behalf of Robert M. Hardaway.

Christopher O. Murray, Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, filed an amicus brief on behalf of Colorado Republican Committee.

---

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.

---

**McHUGH**, Circuit Judge.

---

## TABLE OF CONTENTS


**I. INTRODUCTION** 1

**II. BACKGROUND** 2

**A. Legal Background** 2

**B. Factual History** 4

**C. Procedural History** 7

**III. DISCUSSION PART ONE: STANDING** 9

**A. Standard of Review and Burden of Proof** 10

**B. Political Subdivision Standing Doctrine** 10

1. Legal Background 11

2. Application 11

**C. General Standing Principles** 15

1. Injury in Fact 16

a. *Personal versus official interest* 17

b. *Prospective versus retrospective relief* 18

i. Legal background 18

ii. Application 21

1) Prospective relief 22

2) Retrospective relief 24

a) Mr. Baca's removal from office and referral for prosecution 27

b) Threats against Ms. Baca and Mr. Nemanich 30

c. *Legislator standing* 34

i. Legal background 34

ii. Application 40

2. Traceability and Redressability 43

**IV. DISCUSSION PART TWO: MOOTNESS** 45

**V. DISCUSSION PART THREE: FAILURE TO STATE A CLAIM** 56

**A. Standard of Review** 57

**B. "Person" Under § 1983** 57

**C. Constitutional Violation** 61

1. The Federal Constitution 63

2. Legal Precedent 66

3. Framing the Question 72

a. *Supremacy clause* 73

b. *Tenth Amendment* 76

4. Constitutional Text 78

a. *Appointment power* 78

b. *Article II and the Twelfth Amendment* 83

i. Role of the states after appointment 84

ii. Use of "elector," "vote," and "ballot" 87

1) Contemporaneous dictionary definitions 87

2) Use of "elector" in the Constitution 91

5. Enactment of the Twelfth Amendment 94

6. Historical Practices 98

a. *Elector pledges* 99

b. *Short-form ballots* 101

7. Authoritative Sources 105

**VI. CONCLUSION** 114

## I. INTRODUCTION

Micheal Baca, Polly Baca, and Robert Nemanich (collectively, the Presidential Electors) were appointed as three of Colorado's nine presidential electors for the 2016 general election. Colorado law requires the state's presidential electors to cast their votes for the winner of the popular vote in the state for President and Vice President. Although Colorado law required the Presidential Electors to cast their votes for Hillary Clinton, Mr. Baca cast his vote for John Kasich. In response, Colorado's Secretary of State removed Mr. Baca as an elector and discarded his vote. The state then replaced Mr. Baca with an elector who cast her vote for Hillary Clinton. After witnessing Mr. Baca's removal from office, Ms. Baca and Mr. Nemanich voted for Hillary Clinton despite their desire to vote for John Kasich.

After the vote, the Presidential Electors sued the Colorado Department of State (the Department), alleging a violation of 42 U.S.C. § 1983. The Department moved to dismiss the complaint. The district court granted the motion, concluding the Presidential Electors lacked standing, and, in the alternative, the Presidential Electors had failed to state a claim upon which relief could be granted. The Presidential Electors now appeal.

We conclude Mr. Baca has standing to challenge his personal injury—removal from office and cancellation of his vote—but that none of the Presidential Electors have standing to challenge the institutional injury—a general diminution of their power as electors. Therefore, we AFFIRM the district court's dismissal of Ms. Baca's

and Mr. Nemanich's claims under rule 12(b)(1) for lack of standing but REVERSE the district court's standing determination as to Mr. Baca.

On the merits of Mr. Baca's claim, we conclude the state's removal of Mr. Baca and nullification of his vote were unconstitutional. As a result, Mr. Baca has stated a claim upon which relief can be granted, and we REVERSE the district court's dismissal of his claim under rule 12(b)(6). We therefore REMAND to the district court for further proceedings consistent with this opinion.

## II. BACKGROUND

This opinion is divided in three parts. Our analysis begins, as it must, with our power to decide the issues raised by the parties. Thus, the first part of this opinion considers the standing of each of the Presidential Electors with respect to each of their claims for relief. After concluding that only Mr. Baca has standing, we next consider whether this case is moot. Because we conclude this case is not moot, we turn to the final part of our analysis: whether the state acted unconstitutionally in removing Mr. Baca from office, striking his vote for President, and preventing him from casting a vote for Vice President. But before we tackle these separate parts of the analysis, we place our discussion in context by providing a brief legal background and then setting forth a more detailed factual and procedural history.

### A. *Legal Background*

The United States Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in

the Congress." U.S. Const. art. II, § 1, cl. 2. These presidential electors convene in their respective states and "vote by [distinct] ballot for President and Vice-President." *Id.* amend. XII. The candidates receiving votes for President or Vice President constituting a majority of the electors appointed are elected to those respective offices. *Id.*

Colorado's presidential electors are appointed through the state's general election. Colo. Rev. Stat. § 1-4-301. Nominees for presidential electors are selected at political party conventions or selected by unaffiliated presidential or vice presidential candidates. *Id.* §§ 1-4-302, -303. After being appointed, the presidential electors are required to convene on a specified day to take an oath required by state law and then to cast their ballots for President and Vice President. *Id.* § 1-4-304(1). Colorado requires the presidential electors to "vote for the presidential candidate, and, by separate ballot, vice-presidential candidate who received the highest number of votes at the preceding general election in this state." *Id.* § 1-4-304(5).

If there is a vacancy "in the office of presidential elector because of death, refusal to act, absence, or other cause, the presidential electors present shall immediately proceed to fill the vacancy in the electoral college." *Id.* § 1-4-304(1). After all vacancies are filled, the presidential electors "proceed to perform the duties required of them by the constitution and laws of the United States." *Id.* A presidential elector who attends and votes at the required time and place receives $5 per day of attendance plus mileage reimbursement at $0.15 per mile. *Id.* § 1-4-305.

### B. *Factual History*

In April 2016, Mr. Baca, Ms. Baca, and Mr. Nemanich were nominated as three of the Colorado Democratic Party's presidential electors and, after Hillary Clinton and Tim Kaine won the popular vote in Colorado, were appointed as presidential electors for the state.[1] Concerned about allegations of foreign interference in the election, Mr. Nemanich contacted Colorado's Secretary of State, Wayne Williams, to ask what would happen if a Colorado elector did not vote for Hillary Clinton and Tim Kaine. Secretary Williams responded that "his 'office would likely remove the elector and seat a replacement elector until all nine electoral votes were cast for the winning candidates.'" App. at 15. Secretary Williams also warned that the elector would likely face perjury charges.

In response, Ms. Baca and Mr. Nemanich filed a complaint in the United States District Court for the District of Colorado on December 6, 2016, seeking to enjoin the Secretary from enforcing § 1-4-304(5) on the ground it violated Article II and the Twelfth Amendment to the U.S. Constitution. The district court denied the request for an injunction in an oral ruling on December 12, 2016. *Baca v. Hickenlooper*, No. 16-cv-02986-WYD-NYW, 2016 WL 7384286, at *1 (D. Colo. Dec. 21, 2016). Ms. Baca and Mr. Nemanich then sought an emergency injunction pending appeal, which we denied. Order at 1, *Baca v. Hickenlooper* (*Baca I*), No.

---

[1] At oral argument, the Department claimed Mr. Baca had not been officially appointed. In a post-argument letter to this court, the Department corrected this statement and acknowledged that Mr. Baca's appointment had been finalized.

16-1482 (10th Cir. Dec. 16, 2016).[2] In doing so, we criticized Ms. Baca and Mr. Nemanich for failing to point to any language in Article II or the Twelfth Amendment to support their position. *Id.* at 10. But we also noted that "[t]his is not to say that there is no language in Article II or the Twelfth Amendment that might ultimately support plaintiffs' position." *Id.* at 10 n.3. To the contrary, we predicted in a footnote that an attempt by the state to remove an elector after voting had begun was "unlikely in light of the text of the Twelfth Amendment." *Id.* at 12 n.4. At that stage of the proceedings, however, we concluded the Presidential Electors had "raise[d] at best a debatable argument" and therefore had not met their burden of showing a substantial likelihood of success on the merits. *Id.* at 10–11. We consequently held they were not entitled to an injunction pending appeal. *Id.* at 15.

In an overlapping lawsuit, Secretary Williams sued Ms. Baca and Mr. Nemanich in Colorado state court, seeking guidance on Colorado's law regarding succession of presidential electors. The state district court determined that a presidential elector's failure to vote for Hillary Clinton and Tim Kaine, as required by § 1-4-304(5), is a "refusal to act" under § 1-4-304(1), and therefore "causes a

---

[2] Typically a motion to dismiss under rule 12(b)(6) must rest on the contents of the complaint alone. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). But there is an exception for "matters of which a court may take judicial notice." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "[W]e may exercise our discretion to take judicial notice of publicly-filed records in our courts and certain other courts concerning matters that bear directly upon the disposition of the case at hand." *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007). We therefore consider the decision in *Baca I* and the related state court cases in setting forth the relevant background here.

vacancy in the electoral college." App. at 35. The court further decided that any "vacancy in the electoral college shall be immediately filled by a majority vote of the presidential electors present." *Id.* The Colorado Supreme Court declined a petition for immediate review of that order.[3]

On December 19, 2016, the Colorado electors met to cast their votes. Before voting commenced, Secretary Williams required the electors to take a revised oath that affirmed they would vote consistently with the results of the state's popular election. Secretary Williams also warned that any elector who violated the oath may be subject to felony perjury charges. Despite taking the oath, Mr. Baca crossed out "Hillary Clinton" from his presidential ballot and wrote in "John Kasich." Secretary Williams then removed Mr. Baca as an elector, refused to count his vote, and replaced him with a substitute elector who cast a vote for Hillary Clinton. After this series of events, Ms. Baca and Mr. Nemanich "felt intimidated and pressured to vote against their determined judgment" and cast votes for Hillary Clinton and Tim Kaine. *Id.* at 17. Mr. Baca attempted to vote for Tim Kaine as Vice President, but the

---

[3] The Presidential Electors have not briefed to this court any argument concerning the constitutionality of § 1-4-304(1). Consequently, we do not consider that issue separately. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (determining issues not raised in opening brief on appeal were waived). But if the Constitution does not allow states to directly remove an elector after voting has commenced, they cannot do so indirectly by statute. *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 829 (1995) (rejecting indirect infringement on constitutional protection); *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) ("Constitutional rights would be of little value if they could be . . . indirectly denied." (alteration in original) (quoting *Smith v. Allwright*, 321 U.S. 649, 664 (1944)).

Secretary refused to count his vote. Secretary Williams then referred Mr. Baca to the Colorado Attorney General for criminal investigation.

### C. *Procedural History*

Ms. Baca and Mr. Nemanich voluntarily dismissed their prior case and filed a new complaint, later joined by Mr. Baca, that is the subject of this appeal. The Presidential Electors' Second Amended Complaint asserts a single cause of action under 42 U.S.C. § 1983, alleging a violation of their constitutional rights under Article II and the Twelfth Amendment. The Presidential Electors seek relief in the form of a judgment (1) finding the Department violated their federally protected rights, (2) declaring § 1-4-304(5) unconstitutional, and (3) awarding nominal damages.[4]

The Department filed a motion to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of standing and under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court granted the motion to dismiss on both grounds. First, the district court decided the Presidential Electors lacked standing based on the political subdivision standing doctrine. Second, and in the alternative, the district court concluded the Presidential Electors failed to state a claim upon which relief could be granted because the United States Constitution does not prohibit states from binding electors to vote for the

---

[4] By stipulation, the Department waived any claim to immunity, the Presidential Electors relinquished any claims under 52 U.S.C. §§ 10101, 20510, the Presidential Electors limited their damage claim to nominal damages, and all parties waived the right to recover attorney fees.

candidate who wins the state's popular vote. The Presidential Electors filed a timely notice of appeal, and we have jurisdiction under 28 U.S.C. § 1291 to consider the appeal.

After oral argument in this case, we asked the parties to provide supplemental briefing to address two questions:

> 1. Whether *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989), and/or *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997):
>
> > (a) impact(s) the district court's jurisdiction to entertain this action; or
> >
> > (b) render(s) this case moot by preventing the district court from awarding nominal damages.
>
> 2. Whether this court, assuming jurisdiction, should exercise our discretion to affirm the district court on the alternate ground that the plaintiffs have failed to state a claim upon which relief can be granted because the defendant—the Colorado Department of State—is not a "person" for purposes of liability under 42 U.S.C. § 1983.

Order at 1–2 (July 3, 2019).

The parties filed a joint supplemental response brief acknowledging that the Department is not a "person" for purposes of § 1983. But the parties contend this court's jurisdiction is unaffected. And the Department, "for purposes of this case only, . . . expressly waive[d] the argument that it is not a 'person' under § 1983," ostensibly paving the way for the court "to proceed directly to the important issues discussed extensively in the primary briefing." Joint Resp. to Suppl. Briefing Order at 1.

Our discussion of the jurisdictional and merits issues raised in this appeal will proceed in three parts. In Part One, we address whether the Presidential Electors have standing to pursue their claims. Concluding that only Mr. Baca has standing in this case, we proceed to Part Two, in which we discuss whether this case is moot because the Department is not a person under § 1983. Finally, in Part Three, we analyze whether the district court correctly dismissed Mr. Baca's claim under rule 12(b)(6).

## III. DISCUSSION PART ONE: STANDING

We turn now to the district court's holding that the Presidential Electors lack standing, thereby depriving the district court, and in turn this court, of jurisdiction. First, we set out the applicable standard of review and the burden of proof. Next, we consider the district court's holding that the Presidential Electors lack standing under the political subdivision standing doctrine. Concluding that doctrine is not applicable here, we turn to whether any of the Presidential Electors can satisfy the general standing requirements of injury in fact, traceability, and redressability. Ultimately, we conclude that only Mr. Baca has satisfied the injury-in-fact prong of Article III standing. In reaching this conclusion, we reject Ms. Baca's and Mr. Nemanich's argument that they fall within a unique rule of legislative standing announced by the Supreme Court in *Coleman v. Miller,* 307 U.S. 433 (1939). Instead, only Mr. Baca has asserted a legislative injury. Accordingly, we consider the remaining standing factors—traceability and redressability—only as to Mr. Baca. Because Mr. Baca has satisfied all three prongs of traditional standing, we proceed to the merits of his

claim. But we affirm the district court's dismissal of Ms. Baca's and Mr. Nemanich's claims under Rule 12(b)(1) for lack of standing.

### A. *Standard of Review and Burden of Proof*

We review de novo a district court's dismissal for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). A motion under rule 12(b)(1) can be made on the ground that the plaintiff lacks standing and therefore the court lacks subject matter jurisdiction. *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1188–89 (10th Cir. 2000). "The party invoking federal jurisdiction has the burden to establish that it is proper, and there is a presumption against its existence." *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014) (internal quotation marks omitted).[5]

### B. *Political Subdivision Standing Doctrine*

In reaching its conclusion that the Presidential Electors lack standing, the district court relied on the political subdivision standing doctrine. We first elucidate the legal underpinnings of this doctrine and then explain why it is inapplicable here.

---

[5] The Presidential Electors argue that this court decided the standing issue in *Baca I*. But *Baca I* determined standing "given the preliminary record before us," and only "[a]t this stage of the proceedings." Order at 7, *Baca I*, No. 16-1482. And, importantly, in *Baca I,* Mr. Nemanich and Ms. Baca were seeking only prospective relief while they were under a direct threat of enforcement. Therefore, we agree with the district court that we must visit the standing question anew in this case as to each elector and as to each claim for relief.

**1. Legal Background**

"Under the doctrine of political subdivision standing, federal courts lack jurisdiction over certain controversies between political subdivisions and their parent states." *City of Hugo v. Nichols*, 656 F.3d 1251, 1255 (10th Cir. 2011). This doctrine traces back to at least *City of Trenton v. New Jersey*, in which the Supreme Court recognized that "municipalities have no inherent right of self-government which is beyond the legislative control of the state." 262 U.S. 182, 187 (1923). "[P]olitical subdivisions are created by the state merely for convenience of administration." *City of Hugo*, 656 F.3d at 1255; *see also City of Trenton*, 262 U.S. at 185–86 ("The city is a political subdivision of the state, created as a convenient agency for the exercise of such of the governmental powers of the state as may be intrusted to it."). Therefore, "[a] municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will." *City of Trenton*, 262 U.S. at 187. Thus, "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933).

**2. Application**

According to the district court, the political subdivision standing doctrine applies to both political subdivisions and to state officials. Because the district court

concluded presidential electors are state officials, it also concluded the political subdivision standing doctrine barred the Presidential Electors' standing. The Presidential Electors disagree and argue that presidential electors are not state officials because the "state is not the 'creator' of the office of presidential elector"; rather, "the office is created by the *federal* Constitution." Presidential Electors' Br. at 17. Thus, they contend the political subdivision doctrine does not preclude standing here. In response, the Department asserts that even if the electors are not "political subdivisions," they lack standing because they are state officials and the doctrine "applies not only to artificial political subdivisions, such as municipalities, but also to state officers who attempt to sue the State to challenge state law." Dep't's Br. at 24. The Presidential Electors have the better side of this argument.

Presidential electors are not political subdivisions or municipalities created by the state. The position of presidential elector is established by the federal Constitution. *See* U.S. Const. art. II, § 1, cl. 2. And although presidential electors are not federal officials, they exercise a federal function. *See Ray v. Blair*, 343 U.S. 214, 224 (1952) ("The presidential electors exercise a federal function in balloting for President and Vice-President but they are not federal officers or agents any more than the state elector who votes for congressmen."). Even if that were not the case, the political subdivision standing doctrine does not apply to state officials. A suit against a state official in his or her official capacity is "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). If a state

official is acting as the "State itself," then the state official is not a political subdivision or municipality with a "parent state."

The Department challenges this conclusion, relying on decisions it claims support application of the political subdivision standing doctrine to state officers. But our review of these cases reveals they do not stand for that proposition. Instead, they discuss two different justiciability concerns.[6]

The first concern, discussed in more detail below, is the general proposition that a state official has standing to pursue only a personal, rather than an official, interest. The Supreme Court has long required "the interest of an appellant in this court [to] be a personal, and not an official, interest." *Smith v. Indiana*, 191 U.S. 138, 149 (1903). Almost every case the Department cites applies this personal interest principle, rather than the political subdivision standing doctrine. *See Columbus & Greenville Ry. v. Miller*, 283 U.S. 96, 100 (1931) ("The [Fourteenth Amendment] guaranty does not extend to the mere interest of an official, as such, who has not been deprived his property without due process of law or denied the equal protection of the laws."); *Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 566 (5th Cir. 2008) ("The Supreme Court has held that state officials lack standing to challenge the

---

[6] The Department also claims a footnote in our decision, *City of Hugo v. Nichols*, 656 F.3d 1251, 1255 n.3 (10th Cir. 2011), confirms that the political subdivision standing doctrine applies to state officials suing the state. But the footnote actually explains that the principle that a political subdivision cannot sue the state "applies equally to state officials in their official capacities"—i.e., that political subdivisions cannot sue state officials in their official capacities. *City of Hugo*, 656 F.3d at 1255 n.3 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

constitutional validity of a state statute when they are not adversely affected by the statute, and their interest in the litigation is official, rather than personal."); *Finch v. Miss. State Med. Ass'n, Inc.*, 585 F.2d 765, 774 (5th Cir. 1978) ("The mental disposition of the Governor [believing a state statute is in violation of the federal Constitution] is all that gives him cause to complain; were he to change his mind tomorrow and decide, rightly or wrongly, that the statute is valid, he would no longer have any interest in the case. He has no personal stake in the outcome of this case; he will not be affected favorably by a decision that the statute is unconstitutional nor adversely by a decision that it is valid."). And the one case that does not turn on the nature of a state official's interest properly applies the doctrine to a political subdivision of the state. *See Cooke v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2013 WL 6384218, at *10 (D. Colo. Nov. 27, 2013) (applying the political subdivision standing doctrine to an official capacity suit by a county sheriff because "a county in Colorado is undisputedly a political subdivision of the State of Colorado" and therefore "an official capacity claim asserted by a county Sheriff's Office is a claim asserted by a political subdivision of the State").

As to the second justiciability concern, one of the Department's authorities concludes that jurisdiction is lacking where "state agencies [are] so closely identified with the state government, and so thoroughly controlled by the body they are suing[,] that the litigation amounts to a suit by the state against itself." *Donelon*, 522 F.3d at 567–68 (quoting *Rogers v. Brockette*, 588 F.2d 1057, 1065 (5th Cir. 1979)). In such circumstances, the "state is essentially suing itself," and "there is no 'case or

controversy.'" *Id.* at 568 (quoting *Rogers*, 588 F.2d at 1065). Here, neither party alleges the Presidential Electors are so closely identified with the State of Colorado that the action is essentially the state suing itself.

The political subdivision standing doctrine has no relevance here because presidential electors are not municipalities or subdivisions of the state. And we need not resolve the parties' dispute over whether the Presidential Electors were state officials because, even if they were, the political subdivision standing doctrine does not apply to state officials. In contrast, the personal interest standing requirement, highlighted by the Department's decisions, is applicable to any official—municipal, state, or federal. *See Raines v. Byrd*, 521 U.S. 811, 821 (1997) (applying the personal interest requirement to members of Congress); *Thomas v. Mundell*, 572 F.3d 756, 760–61 (9th Cir. 2009) (applying personal interest requirement to county official).

Thus, we turn now to general legal principles to determine whether the Presidential Electors have standing. This analysis necessarily includes review of whether the alleged injury is to a personal or official interest.

### C. *General Standing Principles*

To satisfy Article III standing, the Presidential Electors must show an injury in fact, fairly traceable to the challenged action, that is redressable by the relief sought. *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 149 (2010). In considering whether standing exists, we focus individually on each plaintiff and on each claim for relief asserted. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

**1. Injury in Fact**

An injury satisfies the Article III standing requirement only if the injury is "'concrete and particularized' and 'actual or imminent, not "conjectural" or "hypothetical."'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Therefore, "a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines*, 521 U.S. at 819; *see also id.* at 818 (requiring a plaintiff to "allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief" (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984))). "[A] dispute solely about the meaning of the law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).

Here, there are three considerations that inform our analysis of the injury-in-fact requirement: (1) whether the Presidential Electors' interest is personal or official in nature; (2) whether the Presidential Electors seek prospective or retrospective relief; and (3) whether the Presidential Electors have standing as legislators. We address each of these concepts in turn.

a. *Personal versus official interest*

"The party raising the question of constitutionality and invoking our jurisdiction must be interested in, and affected adversely by, the act, and the interest must by, the decision of the state court be of a personal, and not of an official, nature." *Braxton Cty. Court v. West Virginia*, 208 U.S. 192, 197 (1908); *see also Smith*, 191 U.S. at 149 ("[T]he interest of an appellant in this court [must] be a personal, and not an official, interest . . . ."); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) ("[T]he challenge by a public official interested only in the performance of his official duty will not be entertained."). A plaintiff is asserting an official, rather than personal, injury if the injury alleged is not based upon something to which the plaintiff is personally entitled but instead based upon the plaintiff's entitlement in his or her official role. *Raines*, 521 U.S. at 821. An official has no personal interest when he has "certain duties as a public officer to perform" and "[t]he performance of those duties was of no personal benefit to him," and "[t]heir nonperformance was equally so." *Smith*, 191 U.S. at 149.

"[A] public official's 'personal dilemma' in performing official duties that he perceives to be unconstitutional does not generate standing." *Thomas*, 572 F.3d at 761 (quoting *City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 237 (9th Cir. 1980)). And the "loss of . . . institutional power" is "not the loss of any private right" as it "run[s] with the office." *Id.* at 762; *see also Donelon*, 522 F.3d at 568 (determining official has no "personal stake" in the litigation where "he

seeks to exercise what he believes are the full extent of his *official* powers under federal and state law").

Whether the Presidential Electors have asserted a personal or official injury is inextricably intertwined with the question of whether the Presidential Electors have asserted an injury sufficient to support prospective or retrospective relief. Thus, we apply the personal injury requirement to the present facts, together with our application of the limitations on the Presidential Electors' ability to seek prospective or retrospective relief, which we now explain.

b. *Prospective versus retrospective relief*

As noted, standing is affected by the nature of the relief sought. Thus, we must determine the type of relief requested and whether the Presidential Electors can assert that claim. We begin with a discussion of the relevant law and then we apply those legal principles to the present facts.

i. <u>Legal background</u>

A plaintiff's "standing for retrospective relief may be based on past injuries, whereas . . . claims for prospective relief require a continuing injury." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109–10 (1983) (recognizing a plaintiff's standing to seek damages but not injunctive relief). To obtain prospective relief, a plaintiff must show a credible threat of future harm. *See Ward v. Utah*, 321 F.3d 1263, 1267–69 (10th Cir. 2003). "[W]hile a plaintiff who has been constitutionally injured can bring a § 1983 action to recover damages

[retrospective relief], that same plaintiff cannot maintain a declaratory or injunctive action [prospective relief] unless he or she can demonstrate a good chance of being likewise injured in the future." *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).

Although an injury must usually be imminent, a plaintiff need not wait for the harm to occur before seeking redress. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Instead, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). But "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185. Thus, where both prospective and retrospective relief are requested, standing for each must be separately established.

In certain circumstances, a plaintiff can maintain a pre-enforcement suit for declaratory or injunctive relief "challeng[ing] a statute that he claims deters the exercise of his constitutional rights" without "first expos[ing] himself to actual arrest or prosecution." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). And even when "the plaintiff ha[s] eliminated the imminent threat of harm by simply not doing what he claimed the right to do," standing is not precluded "because the threat-eliminating behavior was effectively coerced." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 129 (2007). "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it

was the very purpose of the Declaratory Judgment Act to ameliorate.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)).

Therefore, "[w]hen an individual is subject to [a threat of enforcement], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158. Pre-enforcement review is permitted so long as the circumstances "render the threatened enforcement sufficiently imminent." *Id.* at 159. "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt*, 442 U.S. at 298).

This requirement applies even when the law at issue has been enforced against the plaintiff in the past. *See Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009); *see also D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) ("[A]ssurances from prosecutors that they do not intend to bring charges are sufficient to defeat standing, even when the individual plaintiff ha[s] actually been charged or directly threatened with prosecution for the same conduct in the past."); *PeTA*, 298 F.3d at 1202–03. "Past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present, adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). But a plaintiff seeking future relief from a law enforced against him or her in the past can establish the necessary injury in fact by either meeting the requirements

for pre-enforcement review or alleging continuing adverse effects from the prior enforcement. *Dias*, 567 F.3d at 1176–77.

A plaintiff satisfies the injury-in-fact requirement for retrospective relief if he or she "suffered a past injury that is concrete and particularized." *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1).

ii. Application

In this case, the Presidential Electors seek three forms of relief: (1) a declaration that § 1-4-304(5) is unconstitutional, (2) a "[f]inding" that the Department violated their "federally protected rights by depriving [Mr.] Baca of his federal right to act as an Elector and by threatening and intimidating" the Presidential Electors, and (3) nominal damages of $1 each. App. at 19.

Although "a declaratory judgment is generally prospective relief," "we consider declaratory relief retrospective to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred." *PeTA*, 298 F.3d at 1202 n.2. Here, the Presidential Electors' request for a declaration that § 1-4-304(5) is unconstitutional is a traditional claim for prospective declaratory relief. But the Presidential Electors' request for a "[f]inding" that the Department violated their "federally protected rights," App. at 19, and their corresponding request for nominal damages, is a request for retrospective declaratory relief. In the later instance, "declaratory relief is superfluous in light of the damages

claim," *PeTA*, 298 F.3d at 1202 n.2 (internal quotation marks omitted), and it can be pursued only if intertwined with a necessary determination that damages are warranted because a stand-alone retrospective declaratory judgment "would amount to nothing more than a declaration that [the plaintiff] was wronged," *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997). We therefore do not consider the Presidential Electors' claim for a retrospective declaration that the Department violated their constitutional rights during the 2016 election separately from their claim for nominal damages. But we do separately consider their request for prospective relief in the form of a declaration that § 1-4-304(5) is unconstitutional.

We undertake that analysis now to determine whether the Presidential Electors have asserted an injury in fact entitling them to either type of relief, beginning with their claim for prospective relief and then turning to their claim for retrospective relief.

1) Prospective relief

We first consider whether the Presidential Electors have standing to seek prospective relief in the form of a declaration. The sole question with respect to prospective relief is whether any of the Presidential Electors "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute, and [that] there exists a credible threat of prosecution

thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298).[7] We easily answer this question in the negative.

Nowhere in the Second Amended Complaint do the Presidential Electors allege an intent to engage in conduct implicated by § 1-4-304(5) in the future or a credible threat of future prosecution. They do not allege an intention to again run for the position of elector or, if appointed, to vote for an individual for President or Vice President who did not win the popular vote in Colorado.[8] *See Dias*, 567 F.3d 1177 (determining the plaintiffs lacked standing for prospective relief where the challenged ordinance applied only in Denver's limits and there was no "allegation that any of the plaintiffs intend[ed] to return to the City with their dogs," so "there

---

[7] Mr. Baca is the only Presidential Elector who voted in violation of § 1-4-304(5) and suffered ramifications, in the form of removal from office, under § 1-4-304(1). He is therefore the only plaintiff who might establish standing for prospective relief through continuing adverse effects of a prior enforcement. But Mr. Baca has not alleged any continuing adverse effects from the prior enforcement that could be alleviated through prospective relief, so we do not consider this as a potential basis for standing.

[8] Even if the Presidential Electors had alleged an intention to run for elector and, if appointed, to vote for an individual who did not receive the popular vote, such allegations may have been too speculative to support finding a credible threat of prosecution. *Cf. Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (concluding the petitioner lacked standing to challenge a statute prohibiting anonymous handbilling because the petitioner sought only to distribute leaflets relating to a specific Congressman who had left the House of Representatives for a 14-year term on the state supreme court "and the prospect was neither real nor immediate of a campaign involving the congressman, [and] it was wholly conjectural that another occasion might arise when [the petitioner] might be prosecuted for distributing" leaflets relating to the Congressman). Here, it is wholly conjectural that the Presidential Electors would again be selected to serve in that position, let alone that they would desire to vote contrary to the state popular vote.

[was not] a credible threat of future prosecution under the Ordinance”); *see also Steffel*, 415 U.S. at 460 (recognizing that the petitioner may no longer desire to engage in the prohibited handbilling and therefore on remand the district court would have to determine whether there was sufficient immediacy of the threat). Nor does Mr. Baca allege a continuing threat of prosecution for his past violation of § 1-4-304(5); the Presidential Electors acknowledge in their reply brief that the Attorney General ultimately decided not to prosecute. As a result, the Presidential Electors cannot show a credible threat of future enforcement against them. So, none of them alleges an imminent personal injury that could confer standing to seek prospective relief, including their request for a declaration that § 1-4-304(5) is unconstitutional.

2) Retrospective relief

With respect to the claim for retrospective relief, the district court concluded the Presidential Electors did not have a personal stake in the litigation and were merely asserting an official interest based on “the diminution of power that [§ 1-4-304(5)] allegedly causes to the electors’ official role.” App. at 79. We agree that most of the Presidential Electors’ complaint alleges official harm to their role as electors.

Specifically, the Presidential Electors allege they were threatened and intimidated “in the exercise of their federally protected *rights as presidential Electors*.” App. at 8 (emphasis added). They claim § 1-4-304(5) is unconstitutional both “on its face and as applied” because it “infringes on [the Presidential Electors’]

right to vote as they see fit without coercion" and its enforcement "violated [their] *rights as Electors*." *Id.* at 9 (emphasis added). Further, they seek to "correct the violations of their *rights as Electors* under Article II and Amendment XII" because they had "the *legal freedom [as] federal Electors* to vote as they deem[ed] fit." *Id.* (emphases added). And they argue Article II and Amendment XII provide these rights and protections to all members of the electoral college. *See id.* at 18 ("Article II and Amendment XII . . . prohibit any person or any state from interfering with *members of the Electoral College's votes* for President and Vice President of the United States." (emphasis added)); *id.* ("Article II and Amendment XII . . . prohibit any person or state from requiring *members of the Electoral College* to vote for specific candidates for President and Vice President of the United States." (emphasis added); *id.* ("The only limits on *Electors' vote* for President and Vice President of the United States are set forth in Article II and Amendment XII . . . ." (emphasis added)). These alleged injuries are based on the Presidential Electors' official capacity as members of the 2016 electoral college. As a result, their "claim of standing is based on a loss of political power, not loss of any private right." *Raines*, 521 U.S. at 821. And the scope of power exercised by a presidential elector is of no personal benefit to the elector. *Cf. Smith*, 191 U.S. at 149 (denying an official standing because the performance or nonperformance of his official duties "was of no personal benefit to him"). The Presidential Electors have therefore failed to identify through these allegations a personal harm or injury that would entitle them to retrospective relief.

Further, even if the individual electors could base standing on harm suffered in their official capacity, such a rule would not provide standing here because they no longer serve in that official position. The Presidential Electors do not contend their roles as electors extend beyond the 2016 electoral college vote. Instead, the Second Amended Complaint alleges solely that each Presidential Elector "*was* a Democratic Elector for the 2016 presidential election." App. at 9. As the Supreme Court noted in *Raines*, when plaintiffs allege an injury "solely because they are" in an official role, "[t]he claimed injury . . . runs (in a sense) with the [official] seat." 521 U.S. at 821. If the official retires, he "no longer ha[s] a claim; the claim [is] possessed by his successor instead." *Id.* So, even if the Presidential Electors had asserted the official injury suffered by their office, which they did not, they would still lack standing. Simply put, the Presidential Electors have no greater claim than any other citizen for an injury to an office they did not possess at the time they filed this lawsuit. *See United States v. Richardson*, 418 U.S. 166, 176–77 (1974) (rejecting standing for "a generalized grievance" when "the impact on [the plaintiff] is plainly undifferentiated and 'common to all members of the public'" (quoting *Ex parte Levitt*, 302 U.S. 633, 636 (1937))); *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1224 (10th Cir. 2011) ("[S]tanding is assessed as of the time of filing of the complaint.").

Accordingly, the Presidential Electors can establish standing only by alleging a personal injury. The Presidential Electors contend they have alleged a personal injury here because Mr. Baca "was dismissed as an elector, had his vote invalidated, and then was *personally* referred . . . for criminal investigation and potential

prosecution," and Ms. Baca and Mr. Nemanich "were threatened with identical consequences." Presidential Electors' Br. at 23. Our review of the Second Amended Complaint confirms that the Presidential Electors set forth these allegations. *See* App. at 15 (alleging Secretary Williams warned that electors who failed to comply with § 1-4-304(5) would likely be removed and replaced and be subject to perjury charges); *id.* at 17 (alleging Secretary Williams removed Mr. Baca as an elector, refused to count Mr. Baca's vote, replaced Mr. Baca with a substitute, and referred him for criminal investigation and prosecution); *id.* at 18 (contending the Department deprived the Presidential Electors "of a federally protected right when it threatened to remove them as Electors, and refer them for criminal prosecution" and deprived Mr. Baca "of a federally protected right when it removed him as an Elector"). Accordingly, we now consider whether (1) Mr. Baca's removal as an elector and referral for criminal investigation and (2) the threats of those consequences against Ms. Baca and Mr. Nemanich, are personal injuries sufficient to sustain retrospective relief.

a) Mr. Baca's removal from office and referral for prosecution

The district court held that the Presidential Electors suffered no personal injury as a result of removal or threatened removal from office because the role of a presidential elector does not "confer[] any meaningful pecuniary interest or autonomous power" on the elector. App. at 79. The court noted that the electors receive nominal compensation (mileage reimbursement and $5) for attendance at a

one-day meeting where they are required to vote for the candidate who won the popular vote in Colorado. Moreover, "[o]nce the meeting is done and the votes are cast, the electors' duties are over. There is no ongoing 'office' or 'job' that the electors have and risk losing." *Id.* The district court therefore concluded the Presidential Electors had suffered no personal injury that could satisfy the standing requirement. With respect to Mr. Baca, we disagree.

As we discuss below, Mr. Baca has asserted an injury in fact based on the cancellation of his vote for President and the refusal to allow him to cast a vote for Vice President. Mr. Baca has also asserted that he suffered an injury in fact when the Department removed him from his duly-appointed office as a presidential elector. An injury in fact must be actual and concrete, but there is no requirement in standing jurisprudence that the injury involve the loss of a job or office that confers pecuniary interest and ongoing duties. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) ("It has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing."). And the district court's rationale that electors serve a purely ministerial function and must show up and vote for the candidate who won the popular vote inappropriately conflates standing with the merits. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) ("[O]ne must not 'confus[e] weakness on the merits with absence of Article III standing.'" (second alteration in original) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011))).

If the Presidential Electors are correct, presidential electors are constitutionally permitted to exercise discretion in casting one of 538 votes to select the President and Vice President of the United States. Under that interpretation, which we must accept as true for purposes of standing, Mr. Baca's loss of his office—however brief its existence—is an injury in fact. *See Raines*, 521 U.S. at 821 (recognizing officials would have standing to claim "depriv[ation] of something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them*"); *see also Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1248 (10th Cir. 2017) (emphasizing that "an injury [need not] meet some threshold of pervasiveness to satisfy Article III" because "an identifiable trifle is enough for standing to fight out a question of principle" (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973))). Thus, Mr. Baca has shown a concrete injury with respect to his removal from office.

But Mr. Baca has not alleged an injury in fact with respect to his allegation that Secretary Williams referred him to the Colorado Attorney General for investigation and potential prosecution. To be sure, "a criminal prosecution, even one that is swiftly abandoned, can confer standing." *Winsness v. Yocom*, 433 F.3d 727, 734 (10th Cir. 2006). "[W]rongful criminal proceedings cause a judicially cognizable injury that, according to our precedents, may be redressed through nominal damages and retrospective declaratory relief." *Id.* But to have standing, the plaintiff must

"seek compensation for injuries sustained as a result of his criminal prosecution." *Id.* at 735.

The Second Amended Complaint is devoid of any allegation that the state prosecuted Mr. Baca criminally as a result of his vote for John Kasich, or that Mr. Baca suffered any injury stemming from Secretary Williams's referral for criminal investigation.[9] Thus, Mr. Baca has identified a challenged action—referring him for investigation and potential prosecution—but he has failed to allege the referral resulted in any injury.

In summary, Mr. Baca has asserted a personal injury sufficient to meet the Article III standing requirement for retrospective relief based on his removal from an office to which he was entitled. But nowhere does the Second Amended Complaint assert an injury caused by his referral for criminal investigation.

b) Threats against Ms. Baca and Mr. Nemanich

We turn now to whether Ms. Baca and Mr. Nemanich have asserted a personal injury in fact for retrospective relief based on threats to remove them from office and refer them for prosecution if they refused to vote for the winners of the popular vote in Colorado. The Presidential Electors contend that *Board of Education of Central*

[9] The Presidential Electors' reply brief contends, for the first time, that Mr. Baca was subject to "a long investigation that consumed [his] time and money" before the Attorney General decided not to prosecute. Presidential Electors' Reply Br. at 29 n.5. Because this allegation was not included in the complaint, we need not consider whether this injury is fairly traceable to Secretary Williams's referral rather than, as the Department argues, solely to the Attorney General's actual investigation.

*School District No. 1 v. Allen*, 392 U.S. 236 (1968), supports Ms. Baca's and Mr. Nemanich's claims of personal injury. We are not convinced.

In *Allen*, two local boards of education sued to declare a state statute unconstitutional and to bar the commissioner of education from removing the members from office for failing to comply with it. 392 U.S. at 240 & n.4. The boards claimed the statute that required local public schools to lend textbooks free of charge to parochial schools violated the Establishment Clause and, therefore, compliance with the statute would violate their oaths to support the United States Constitution. *Id.* at 240–41. The Supreme Court addressed standing in a footnote, stating:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants [the two boards] have taken an oath to support the United States Constitution. Believing [section] 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with [section] 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation.

*Id.* at 241 n.5 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Even if the *Allen* footnote could be read broadly to support the Presidential Electors' standing argument, subsequent decisions from the Supreme Court have limited its reach. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974) (holding that a "generalized interest of all citizens in constitutional governance" cannot confer standing); *Richardson*, 418 U.S. at 176–77 (determining taxpayer's claim that the Central Intelligence Agency Act violated art. I, § 9, cl. 7, of the United States Constitution was "the kind of a generalized grievance" that could

not confer standing); *see also City of S. Lake Tahoe*, 625 F.2d at 235–36 (examining Supreme Court authority pre- and post-*Allen* and concluding subsequent decisions from the Court "significantly tightened standing requirements"). Based on these later Supreme Court pronouncements, some lower courts have departed from *Allen* where the officials "were not required to do anything that was specifically prohibited by an express term of the constitution" or were elected and therefore "in no danger of expulsion from office as a result of any action that [the official] alone believes may have violated his oath." *Finch*, 585 F.2d at 773–74.[10]

Here, we need not consider *Allen*'s continuing vitality because even assuming its footnote remains precedential, Ms. Baca and Mr. Nemanich cannot establish standing to seek *retrospective* relief based on the threats to remove them from office and refer them for prosecution. In *Allen*, the petitioners sought *prospective* relief in the form of an injunction and a declaratory judgment. 392 U.S. at 240. As discussed, however, the Presidential Electors do not have standing to seek prospective relief because they have not alleged facts that show a credible threat of future enforcement. *See Bronson v. Swensen*, 500 F.3d 1099, 1112 (10th Cir. 2007) (recognizing that plaintiffs' allegations of a "credible 'threat' of prosecution" "cast[s] their injury-in-fact in prospective-relief terms"); *Winsness*, 433 F.3d at 732 ("When he can

[10] In the context of the political subdivision standing doctrine, we have also distinguished *Allen*. In *City of Hugo*, we reasoned that standing in *Allen* was "based on the individual board members' personal stake in losing their jobs." 656 F.3d at 1260. *But see id.* at 1269 (Matheson, J., dissenting) (noting that in *Allen* "the school boards, not their individual members, were the plaintiffs").

show that he faces a credible threat of prosecution, a plaintiff can sue for *prospective* relief against enforcement." (emphasis added) (internal quotation marks omitted)).

Nor can they rely on *past* threats of enforcement to show an actual injury with respect to retrospective relief because they have failed to argue any actual injury stemming from that threat. *See Dias*, 567 F.3d at 1178 (recognizing plaintiffs had suffered actual injuries for retrospective relief where two plaintiffs "were forced to move from Denver to avoid the reach of the Ordinance" and the third plaintiff's dog "was seized by animal control officers," and the plaintiff "was charged with a criminal violation of the Ordinance"); *PeTA*, 298 F.3d at 1203 (determining there was standing for purposes of retrospective relief because "PeTA suffered an injury in fact to its constitutionally protected right to free speech when the defendants threatened the protestors with arrest if they did not cease their demonstration" and PeTA ceased protesting in response to the threat).

Our unaided review of the Second Amended Complaint reveals a single relevant allegation: based on Secretary Williams "changing the oath and removing [Mr.] Baca," Ms. Baca and Mr. Nemanich "felt intimidated and pressured to vote against their determined judgment." App. at 17. This allegation supports a contention that Ms. Baca and Mr. Nemanich felt unable to exercise what they believe is the full range of discretion in their roles as electors. As with most of the allegations in the complaint, however, this injury impacts only their official function as it is "not claimed in any private capacity but solely because they" were members of the electoral college. *Raines*, 521 U.S. at 821; *see also id.* (recognizing claim for official

injury where the "claim of standing is based on a loss of political power, not loss of any private right"). Unlike plaintiffs asserting a personal constitutional right, Ms. Baca and Mr. Nemanich are claiming injury based on their official roles as electors based on threats made against all of Colorado's electors. The injury alleged is a general diminution of the power of the office generally. This is not sufficient to meet the personal injury-in-fact requirement of standing.

c. *Legislator standing*

The Presidential Electors also claim they fall within a limited exception to the personal injury requirement: legislators, suing as a bloc, have standing to enforce the effectiveness of their votes when their votes were sufficient to defeat or enact legislation. *Coleman*, 307 U.S. at 438; *see also Kerr v. Hickenlooper*, 824 F.3d 1207, 1215 (10th Cir. 2016) (recognizing the injury in *Coleman* as an injury suffered in the legislators' official capacity). To address this argument, we begin by discussing the requirements for standing under *Coleman* and its progeny. After, we consider whether the Presidential Electors meet those requirements.

i. Legal background

The Supreme Court first considered the question of legislator standing in *Coleman*, where twenty of Kansas's forty Senators who had voted against a resolution ratifying the Child Labor Amendment to the federal Constitution sued to give effect to their votes. 307 U.S. at 436. According to the plaintiff legislators, Kansas's Lieutenant Governor had acted beyond his authority when he broke the tie, voting in favor of ratification, allowing the resolution to pass the Kansas House. *Id.*

The Supreme Court described the plaintiffs as "twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification." *Id.* at 438. The Court concluded those "senators have a plain, direct[,] and adequate interest in maintaining the effectiveness of their votes," and therefore had standing to pursue their "claimed . . . right and privilege under the Constitution of the United States to have their votes given effect." *Id.*

The Supreme Court again considered legislator standing in *Raines*, where six individual members of Congress challenged the Line Item Veto Act as unconstitutional. 521 U.S. at 814. Focusing on two main concerns, the Court concluded the Congressmen could show no personal injury and therefore lacked standing. First, the Congressmen were not "singled out for specifically unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), that necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821. Second, the Congressmen were not claiming "they ha[d] been deprive[d] of something to which they *personally* [were] entitled," because their "claim of standing [was] based on a loss of political power, not loss of any private right," and that injury was "not claimed in any private capacity but solely because they are Members of Congress." *Id.* Important for our purposes, the Court explained that if "one of the Members were to retire tomorrow, he would no longer have a claim; the

claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat." *Id.*

The Court distinguished *Raines* from *Coleman*, emphasizing that *Coleman* stood for, at most, "the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative Act goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 823; *see also Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954 (2019) (distinguishing *Coleman* because the present case "does not concern the results of a legislative chamber's poll or the validity of any counted or uncounted votes"). The Court also "attach[ed] some importance to the fact that [the Congressmen] have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Raines*, 521 U.S. at 829; *see also Va. House of Delegates*, 139 S. Ct. at 1953 ("Just as individual members lack standing to assert the institutional interests of a legislature, a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole." (citation omitted)); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986) ("Generally speaking, members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take."); *United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose

the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole . . . .”).

Significant for our purposes, the Court in *Raines* also included a footnote that suggests standing can be based on the discriminatory treatment of a legislator’s vote. “Just as appellees cannot show that their vote was denied or nullified as in *Coleman* (in the sense that a bill they voted for would have become law if their vote had not been stripped of its validity), so are they unable to show that their vote was denied or nullified in a discriminatory manner (in the sense that their vote was denied its full validity on relation to the votes of their colleagues).” *Raines*, 521 U.S. at 824 n.7. That is, while diminution of the effectiveness of all votes equally is an institutional injury, a legislator whose vote is singled out for disparate treatment may have suffered a personal injury.

The Supreme Court next visited the question of legislative standing in *Arizona State Legislature*, 135 S. Ct. 2652. There, the Arizona Legislature claimed a recently passed citizens’ initiative establishing an independent redistricting commission unconstitutionally infringed on the Arizona Legislature’s constitutional responsibility for redistricting. 135 S. Ct. at 2663. The Court determined that, in contrast to *Raines*, the Arizona Legislature itself had standing to pursue this claim because it was “an institutional plaintiff asserting an institutional injury, and it commenced th[e] action after authorizing votes in both of its chambers.” *Id.* at 2664. And, as in *Coleman*, the Arizona Legislature challenged an action that would “completely nullif[y]” an

otherwise effective vote of the institution. *Id.* at 2665 (alteration in original) (quoting *Raines*, 521 U.S. at 823).

This court had occasion to apply the holding of *Arizona State Legislature* in *Kerr*, 824 F.3d 1207. There, several parties, including a group of current state legislators, challenged the constitutionality of a provision of the Colorado Constitution that limited the revenue-raising powers of state and local governments. *Kerr*, 824 F.3d at 1211. We held the individual legislators lacked standing to assert an institutional injury, which we defined as "those that do not 'zero[] in on any individual Member'" but instead are "'[w]idely dispersed' and 'necessarily impact[] all [m]embers of [a legislature] equally.'" *Id.* at 1214 (first, second, fourth, and fifth alterations in original) (quoting *Arizona State Legislature*, 135 S. Ct. at 2664).

In *Kerr*, we identified three types of legislator standing recognized by *Coleman* and its progeny. The first type, illustrated by *Arizona State Legislature*, is an institutional injury—"a harm inflicted on a legislature itself, such that it necessarily impacts all members of that legislature in equal measure." *Kerr*, 824 F.3d at 1215. A claim for redress of such an injury can be brought solely by an institutional plaintiff. "[I]ndividual legislators may not support standing by alleging only an institutional injury." *Id.* at 1214.[11]

---

[11] This court has left open the question whether a group of legislators large enough to prevail on a vote would have standing to assert an institutional injury. *Kerr v. Hickenlooper*, 824 F.3d 1207, 1215 n.1 (10th Cir. 2016). We likewise need not decide that question here.

The second type of legislator standing, recognized in *Coleman*, is an injury suffered by a bloc of legislators large enough to prevail on a vote, although in an *official* capacity, based on the complete nullification of their votes. *Id.* Such a claim can be asserted by the bloc of legislators, even without the authorization of the legislative body itself, if that bloc is large enough to have controlled the result of the legislative action. *Id.* at 1214–15.

The third type of legislator standing is where an individual legislator suffers a personal injury. *Id.* at 1216. "For example, if a particular subset of legislators was barred from exercising their right to vote on bills, such an injury would likely be sufficient to establish a personal injury." *Id.*; *see also Raines*, 521 U.S. at 824 n.7 (distinguishing from arguments where legislators' "vote was denied or nullified in a discriminatory manner (in the sense that their vote was denied its full validity in relation to the votes of their colleagues)"). A claim of this nature "zeroes in on the individual and is thus concrete and particularized." *Kerr*, 824 F.3d at 1216.

The Presidential Electors never mention *Raines*, *Arizona State Legislature*, or *Kerr* in their briefs to this court. This is surprising because the district court relied on all three cases in denying standing, and the Department cites them in asking us to affirm the district court's decision. Because these cases represent the Supreme Court's and this court's direction on legislative standing, we explain why none support a conclusion that Ms. Baca and Mr. Nemanich can advance their claims here, but they do support Mr. Baca's claim for standing based on the nullification of his vote and his removal from office.

ii. Application

Although the Presidential Electors do mention *Coleman*, they give it little attention, devoting only one paragraph in their opening brief to claim that "as presidential electors for Colorado, each [Presidential Elector] was entitled to have his or her votes properly counted once voting began." Presidential Electors' Br. at 22. And in their reply brief, the Presidential Electors contend they need not comprise a majority of Colorado's electors to have standing under *Coleman* because "unlike a legislature, which makes decisions as a body, each elector has an individual right to vote and then transmit that vote directly to the Congress." Presidential Electors' Reply Br. at 30. The Presidential Electors' arguments are unpersuasive as to Ms. Baca and Mr. Nemanich for two reasons.

First, the Supreme Court explicitly noted in *Raines* that, at most, *Coleman* stood for "the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative Act goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." 521 U.S. at 823. *Coleman*, therefore, provides that a group of legislators whose votes are sufficient to achieve their desired outcome have standing to challenge the nullification of those votes and the corresponding contrary result. Here, even if Mr. Baca, Ms. Baca and Mr. Nemanich had successfully voted for John Kasich, the winner of the 2016 presidential election would not have changed. Donald J. Trump would have still received 304 electoral votes, 163 Cong. Rec. H189 (daily

ed. Jan. 6, 2017), a number constituting "the majority of the whole number of Electors appointed," U.S. Const. amend. XII.

Second, the Presidential Electors are not seeking the type of relief recognized in *Coleman* because they are not suing to effectuate their votes. The votes Ms. Baca and Mr. Nemanich cast were certified and delivered to the President of the Senate, where they were counted. And although Mr. Baca's vote for President was not counted, he is not seeking to somehow belatedly credit that vote. In *Coleman*, the senators sought to compel other state actors to implement the results of their vote. 307 U.S. at 436. In explaining why the senators had standing, the Court said, "[w]e think that these senators have a plain, direct[,] and adequate interest in *maintaining the effectiveness of their votes*." *Id.* at 438 (emphasis added).[12]

Rather, the Presidential Electors' main challenge to § 1-4-304(5) is that it "restrict[s] the legal freedom of federal Electors to vote as they deem fit." App. at 9. This injury impacts all of Colorado's presidential electors equally. Consequently, the Department contends the Presidential Electors allege an institutional injury they cannot pursue because they "were not authorized to represent Colorado's Electoral College as a whole." Dep't's Br. at 32. The Presidential Electors disagree, asserting

[12] In a later opinion, albeit in dicta, the Supreme Court recognized that a school board member seeking to protect the effectiveness of his vote would be required to seek "mandamus or like remedy." *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 n.7 (1986) (describing *Coleman* as a "mandamus action 'to compel a proper record of legislative action'"). The Supreme Court has also recognized an institution's standing to seek prospective relief against a law that would completely nullify the institution's otherwise effective vote. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 (2015).

that "unlike a legislature, which makes decisions as a body, each elector has an individual right to vote and then transmit that vote directly to Congress." Presidential Electors' Reply Br. at 30.

If the Department is correct and Colorado's electors constitute an institutional body for purposes of standing, the harm created by § 1-4-304(5) is an institutional injury because it necessarily "impacts all members of that [body] in equal measure." *Kerr*, 824 F.3d at 1215. "[*O*]*nly* an institutional plaintiff possesses standing to assert an institutional injury." *Id.* Because the Presidential Electors do not represent a majority of the Colorado electors[13]—the relevant institution under the Department's theory—they lack standing to sue for an institutional injury.

If, however, the Presidential Electors are correct and each elector has an individually enforceable right to vote freely, the Presidential Electors still cannot point to an individualized injury that would permit them to seek relief to protect that right. First, the threats were made against all Colorado electors equally. They did not zero in on Ms. Baca and Mr. Nemanich individually and thus cannot support a personal injury. Second, the Presidential Electors did not bring their claim in an official capacity. And, for the reasons discussed in greater detail above, even if they had done so, they would lack standing for an official injury because they are not still

[13] The Presidential Electors represent only three of Colorado's nine electors. The Presidential Electors do not argue that, if Colorado's electors are the relevant institutional body, fewer than a majority of the electors would be sufficient to act on behalf of the institution.

electors. *See* App. at 9 (claiming each Presidential Elector "*was* a Democratic Elector for the 2016 presidential election").

Accordingly, the only potential for legislative standing is under the third proposition we elicited from *Coleman* in *Kerr*: where an individual legislator suffers a personal injury. *See Kerr,* 824 F.3d at 1216 ("For example, if a particular subset of legislators was barred from exercising their right to vote on bills, such an injury would likely be sufficient to establish a personal injury."). Here, Mr. Baca has alleged that the Department struck his vote for President and removed him from office, preventing him from casting his vote for Vice President. This is the type of injury that "zeros in on [Mr. Baca] individually and is thus concrete and particularized." *Id.* He has therefore alleged a personal injury in fact.

In sum, only Mr. Baca has established an injury in fact, and he has done so solely with respect to his claim for retrospective damages for his removal from office and the nullification of his vote.

**2. Traceability and Redressability**

Because we conclude Mr. Baca has alleged an injury in fact for purposes of retrospective relief, we now address whether that injury is fairly traceable to the Department's conduct and redressable by the relief sought. *Monsanto*, 561 U.S. at 149. We conclude Mr. Baca meets both requirements.

The complaint alleges "Secretary Williams, acting on behalf of the Colorado Department of State, willfully removed [Mr.] Baca as an Elector [and] refused to count Mr. Baca's vote [for President or Vice President]." App. at 17. Mr. Baca's

injuries—removal from office and nullification of his vote—are fairly traceable to the Department's conduct—removing him from office and striking his vote for President. And the complaint seeks a determination that the Department violated Mr. Baca's "federal right to act as an Elector," entitling him to "nominal damages of $1 . . . for the violation of [his] rights." *Id.* at 19. Nominal damages are sufficient to satisfy the redressability requirement for a § 1983 action. *See Faustin v. City, Cty. of Denver, Colo.*, 268 F.3d 942, 948 (10th Cir. 2001).

* * *

In summary, none of the Presidential Electors alleged a personal injury sufficient to obtain the prospective relief they seek, and only Mr. Baca alleged a personal injury sufficient to obtain retrospective relief. Mr. Baca has also satisfied the requirements of traceability and redressability as to his claim for retrospective relief.

We therefore affirm the district court's dismissal of Ms. Baca's and Mr. Nemanich's claims under rule 12(b)(1). We also affirm the district court's dismissal of Mr. Baca's claim under rule 12(b)(1)—to the extent he seeks prospective relief—because Mr. Baca has not alleged a continuing threat that § 1-4-304(5) will be enforced against him. But we conclude the district court erred in dismissing Mr. Baca's claim to the extent he seeks retrospective relief because he has standing based on his removal from his role of elector and the cancellation of his vote.

## IV. DISCUSSION PART TWO: MOOTNESS

Having determined Mr. Baca has standing to pursue retrospective relief, we turn to another potential jurisdictional bar: mootness. Mr. Baca brought his claim under 42 U.S.C. § 1983, which requires Mr. Baca prove (1) a person, (2) acting under color of state law, (3) deprived him of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Relying on *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997), the dissent concludes that because the Department is not a person for purposes of § 1983, and Mr. Baca therefore cannot satisfy the first element of his § 1983 claim, this case is moot. Respectfully, we disagree that the defect in the merits of Mr. Baca's claim—a defect that the Department expressly waived—renders this case moot.

Mootness "has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English*, 520 U.S. at 68 n.22 (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). Thus, a case becomes moot when "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit[] at any point during litigation." *Campbell-Edwald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) (distinguishing standing doctrine from mootness because "by the time mootness is an issue, the case has been brought and litigated, often . . . for

years”). Although some subsequent actions will clearly moot a case by depriving the parties of a continuing interest in the litigation, “as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died,” we must also be mindful that “[t]o abandon the case at an advanced stage may prove more wasteful than frugal.” *Friends of the Earth*, 528 U.S. at 191–92.

Here, there has been no “intervening circumstance” that could render this case moot. From its initiation, Mr. Baca has sought both prospective and retrospective relief, the latter of which includes a claim for nominal damages. Thus, the defect in the merits of Mr. Baca’s § 1983 claim does not render the dispute before us moot. *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018) (“The doctrine of mootness in no way depends on the merits of the plaintiff’s contention.” (quotation marks omitted)). Nor do we read *Arizonans* as holding otherwise.

In *Arizonans*, the plaintiff Yniguez, a state employee, sued the state of Arizona (along with state officials) pursuant to § 1983, seeking both a declaration that an amendment to the Arizona Constitution requiring the State to “act in English and in no other language” was unconstitutional, and an order enjoining its enforcement. 520 U.S. at 49–51. While her case was pending before the Ninth Circuit, Yniguez resigned from state employment, and Arizona’s Attorney General suggested that this new development rendered the case moot because it now “lack[ed] a viable plaintiff.” *Id.* at 59–60. The Ninth Circuit rejected the suggestion of mootness, noting that although Yniguez “may no longer be affected by the English only provision” (and therefore lacked any continuing interest in injunctive relief), she could still pursue

nominal damages despite failing to "expressly request nominal damages" in her complaint. *Id.* at 60 (quoting *Yniguez v. Arizona*, 975 F.2d 646, 647 (9th Cir. 1992)). The Ninth Circuit then returned the case to district court to provide Yniguez an opportunity to "place before the [court], explicitly, the issue of nominal damages." *Id.* at 60–61.

The Supreme Court rejected this attempt to create a claim for nominal damages to "overcome" mootness. Because § 1983 actions "do not lie against a State," *id.* at 69, the Court concluded, "[i]t should have been clear to the Court of Appeals that a claim for nominal damages, extracted late in the day from Yniguez's general prayer for relief and asserted solely to avoid otherwise certain mootness, bore close inspection. On such inspection, the Ninth Circuit might have perceived that Yniguez's plea for nominal damages could not genuinely revive the case." *Id.* at 71 (citation omitted). But, crucially, it was not the failure of the improvised nominal-damages claim under § 1983 that mooted the case; it was Yniguez's departure from state employment: "Yniguez's changed circumstances—her resignation from public sector employment to pursue work in the private sector—mooted the case stated in her complaint." *Id*. at 72. With respect to the rejection of the tardy nominal damages claim, the Court concluded the claim could not be added to the action because it was futile. *See McKinley v. Kaplan,* 177 F.3d 1253, 1256 (11th Cir. 1999) ("[T]he reason the plaintiff's attempted addition of a damages claim could not obviate the mootness problem in *Arizonans for Official English* was that such a damages claim would, as a matter of law, be non-meritorious and futile.").

*Arizonans* does not teach that any claim for damages against a state pursuant to § 1983 is moot; it stands for the narrower proposition that a last-minute claim for legally unavailable relief cannot overcome certain mootness. *See id.* at 69 ("[T]he claim for relief the Ninth Circuit found sufficient to *overcome* mootness was nonexistent." (emphasis added)). Decisions from other circuits and an unpublished decision from this circuit are consistent with this reading of *Arizonans*. *See Chi. United Indus. v. City of Chicago*, 445 F.3d 940, 948 (7th Cir. 2006) (holding that a damage claim saved the case from complete mootness and citing *Arizonans* as creating an exception "for cases in which a damages claim is added at the last minute in a desperate attempt to stave off the dismissal of the case as moot"); *Lillbask v. Conn. Dep't of Educ.,* 397 F.3d 77, 90 (2d Cir. 2005) (upholding dismissal of the action as moot despite general claim for such "other relief as the Court deems just and proper" and citing *Arizonans* as directing close inspection of a claim for nominal damages extracted late in the day from a general prayer for relief); *Harris v. Itzhaki,* 183 F.3d 1043, 1050 (9th Cir. 1999) (holding that claims for prospective relief had become moot, but that damage claim *included in plaintiff's initial prayer for relief* was unaffected by *Arizonans*); *Harris v. City of Houston,* 151 F.3d 186, 191 (5th Cir. 1998) (citing *Arizonans* and holding case was moot where "the appellants limited and focused their pleading and arguments solely to enjoining the annexation and election" and did not seek damages); *Thomas R.W. ex rel. Pamela R. v. Mass. Dep't of Educ.,* 130 F.3d 477, 480–81 (1st Cir. 1997) (relying on *Arizonans* to hold that a reimbursement claim *first raised in the reply brief on appeal* "was too little, too late"

to "supply the residual live controversy necessary to preserve his entire case from being mooted"); *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 141 (2d Cir. 1994) (rejecting attempt to add nominal damages claim to overcome mootness where the complaint contained "absolutely no specific mention . . . of nominal damages"); *see also Olson v. City of Golden*, 541 F. App'x 824, 829 (10th Cir. 2013) (noting that while "a claim for nominal damages will satisfy Article III's case or controversy requirement . . . the circumstances of this case do not warrant applying that rule to a claim for nominal damages 'extracted late in the day from [Olson's] general prayer for relief and asserted solely to avoid otherwise certain mootness'" (quoting *Arizonans*, 520 U.S. at 71)).

Unlike Yniguez's claim in *Arizonans*, Mr. Baca's claim has always been for both prospective relief (injunction) and retrospective relief (nominal damages and retrospective declaration). And there has been no change in the status of the parties since the complaint was filed.

To be sure, there is a major flaw in the merits of Mr. Baca's § 1983 claim. As the parties acknowledged in supplemental briefing, Mr. Baca cannot satisfy the first prong of a § 1983 claim because the Department is not a person for purposes of the statute. *Will*, 491 US at 70–71.

But neither in the district court nor in the briefing here did the Department raise this argument. And in its supplemental briefing, the Department confirms that, for purposes of this case, it has expressly waived the argument that it is not a person under § 1983. Assuming Mr. Baca can meet the other requirements of his § 1983

claim—the Department was acting under state law and he was deprived of a constitutional right—Mr. Baca may prevail on his claim and be entitled to nominal damages. *See* 42 U.S.C. § 1983; *Faustin*, 268 F.3d at 948 (recognizing nominal damages are available for a § 1983 claim). And this court has squarely held that a complaint for nominal damages survives mootness even where prospective relief is no longer available. *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004); *see also id.* at 1258 ("[A]lthough the conduct at issue is long past and will not be repeated, the Ordinance under challenge has been amended to correct its alleged constitutional flaw, and Plaintiff concedes that it suffered no compensable injury, under our precedents this panel is required to determine on the merits whether Defendant's past conduct and no-longer-operative Ordinance comported with the First Amendment.").

The dissent suggests that the merits defect in Mr. Baca's case means there is no chance of money changing hands and further concludes this lack of remedy renders the claim moot. Dissenting Op. at 2. We disagree. Mr. Baca is seeking, and upon prevailing would be entitled to, nominal damages in the form of $1. And because the Department waived Eleventh Amendment immunity in this case, damages can be awarded. Thus, assuming Mr. Baca succeeds on the merits of his claim, there is no legal reason Mr. Baca would not be entitled to receive his nominal damages award and therefore a remedy is available in this case.

The dissent's argument does not apply the appropriate test. That is, its determination is dependent upon a decision by this court to raise sua sponte the

personhood argument expressly waived by the Department. Only if we do so would it be impossible for Mr. Baca to prevail on his § 1983 claim. But, insofar as we are considering mootness, we may not consider the merits of the personhood argument because the mootness inquiry "in no way depends on the merits of the plaintiff's contention." *Keller Tank Servs. II, Inc. v. Comm'r*, 854 F.3d 1178, 1194 (10th Cir. 2017) (quoting *Smith v. SEC*, 129 F.3d 356, 363 (6th Cir. 1997)). In evaluating mootness, "the court *assumes the plaintiff will receive the relief that he requests* in this litigation[] and then proceeds to determine whether there is a substantial likelihood that that relief will redress his asserted injury." *Id.* (emphasis added) (quoting *Smith*, 129 F.3d at 364).

The dissent also suggests that it is "appropriate to consider the 'personhood argument' in relation to mootness" because "[a]t the pleading stage[] a plaintiff must invoke our power to adjudicate a case by sufficiently alleging the prerequisites to subject-matter jurisdiction" and Mr. Baca has failed to do so because "the availability of nominal damages is clearly foreclosed by *Lapides* [*v. Bd. of Regents*, 535 U.S. 613 (2002)], *Arizonans*, and *Will*." Dissenting Op. at 3 n.3. Although we do not view it as part of our mootness analysis, we agree that a plaintiff must plead a colorable claim to invoke federal jurisdiction under 28 U.S.C. § 1331. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 n.10 (2006). But, unlike the dissent, we conclude the § 1983 claim here was not so wholly frivolous as to preclude the district court's exercise of federal question jurisdiction.

The Supreme Court has "long distinguished between failing to raise a substantial federal question for jurisdictional purposes . . . and failing to state a claim for relief on the merits; only 'wholly insubstantial and frivolous' claims implicate the former." *Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). "'"[C]onstitutional insubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit."' And the adverbs were no mere throwaways; '[t]he limiting words "wholly" and "obviously" have cogent legal significance.'" *Id.* (second alteration in original) (citation omitted) (quoting *Goosby v. Osser*, 409 U.S. 512, 518 (1973)). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of any merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)). "A claim is insubstantial only if 'its unsoundness so clearly results from the previous decisions of [the Supreme] Court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.'" *Goosby*, 409 U.S. at 518 (quoting *Ex parte Poresky*, 290 U.S. 30, 32 (1933)).

Here, Mr. Baca has sued the Colorado Department of State. From *Will*, we know that "neither a State nor its officials acting in their official capacities are

'persons' under § 1983." 491 U.S. at 71. And the Supreme Court later emphasized that "*Will* establishes that the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court." *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 365 (1990).

Whether the Department is a "person" under § 1983 therefore depends on whether the Department would enjoy Eleventh Amendment immunity as an arm-of-the-state. In undertaking this analysis, we consider "four primary factors":

> First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.

*Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) (citations omitted). With respect to the entity's finances, we also must look to whether a "money judgment sought is to be satisfied out of the state treasury," focusing "on legal liability for a judgment, rather than [the] practical, or indirect, impact a judgment would have on a state's treasury." *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000) (quotation marks omitted).

Although the parties now concede that the Department is not a person under § 1983, it was not obvious from the face of the complaint that the Department meets

our Eleventh Amendment immunity test (and therefore is not a person under § 1983). Thus, the federal claim asserted is not "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of any merit as not to involve a federal controversy." *Steel Co.*, 523 U.S. at 89 (quoting *Oneida Indian Nation of N.Y.*, 414 U.S. at 666). When this court, and our district courts, evaluate whether an entity, including an entity labeled a state's "department," is an arm-of-the-state for either § 1983 personhood or Eleventh Amendment immunity purposes, the analysis often includes a lengthy discussion of the features of the particular department, and when dismissal is based on a lack of personhood under § 1983, that decision is on the merits. *See, e.g.*, *Ruiz v. McDonnell*, 299 F.3d 1173, 1180–82 (10th Cir. 2002) (analyzing whether the Colorado Department of Human Services was entitled to Eleventh Amendment immunity under Federal Rule of Civil Procedure 12(b)(1), but considering whether the Department was a person for purposes of § 1983 under rule 12(b)(6)); *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1420 n.1 (10th Cir. 1997) (applying the Eleventh Amendment immunity test to the Utah Department of Public Safety, the Utah State Fire Marshal Division, and the Utah Liquefied Petroleum Gas Board by analyzing state statutes and concluding jurisdiction was lacking); *Divine Church of God & Christ v. Taxation & Revenue Dep't*, No. 97-2068, 1997 WL 355326, at *2 (10th Cir. June 27, 1997) (turning to state statutes to determine whether Taxation and Revenue Department of New Mexico met the Eleventh Amendment immunity factors, and holding that the district court erred in the absence of an express waiver of immunity); *Roybal-Mack v.*

*N.M. Dep't of Pub. Safety*, 286 F. Supp. 3d 1226, 1238–39 (D.N.M. 2017) (granting rule 12(b)(6) dismissal on additional ground that the New Mexico Department of Public Safety and the New Mexico State Police were not persons under § 1983); *Ross v. Colo. Dep't of Transp.*, No. 11-cv-02603-REB-KMT, 2012 WL 5975086, at *5–6 (D. Colo. Nov. 14, 2012) (concluding the Colorado Department of Transportation did not meet its burden of proving it was entitled to Eleventh Amendment immunity despite the Department arguing it was a "'principal department' of the state of Colorado"); *Armijo v. New Mexico*, No. CIV 08-0336 JB/ACT, 2009 WL 3672828, at *2–3 (D.N.M. Sept. 30, 2009) (concluding the New Mexico Department of Transportation is not a person under § 1983 and holding that "dismissal for such a defect is for failure to state a claim under rule 12(b)(6) and not for lack of subject-matter jurisdiction").

For the personhood defect to deprive the district court of federal question jurisdiction, the answer to whether the Department is a person under § 1983 must "so clearly result[] from the previous decisions of [the Supreme] Court as to foreclose the subject and leave no inference that the questions sought to be raised can be the subject of controversy." *Goosby*, 409 U.S. at 518 (quoting *Ex parte Poresky*, 290 U.S. at 32). But we have found no decision of the Supreme Court that forecloses that subject and our own precedent dictates that whether a department is an arm of the state can be answered only after analyzing (1) "the character ascribed to the [Department] under state law," (2) "the autonomy accorded the [Department] under state law," (3) "the [Department's] finance," including "the amount of state funding

the entity receives" and whether it "has the ability to issue bonds or levy state taxes on its own behalf," and (4) whether the Department "is concerned primarily with local or state affairs." *Steadfast Ins.*, 507 F.3d at 1253. Based on the factual complexity of the required analysis, we cannot conclude "that the cause of action alleged is so patently without merit as to justify . . . the court's dismissal for want [of] jurisdiction." *Bell*, 327 U.S. at 683. Accordingly, we are convinced the district court properly exercised jurisdiction under § 1331.

Mr. Baca, if successful on his § 1983 claim, would be entitled to relief in the form of nominal damages. Thus, the issues presented in this case are still "live" and "the parties [have] a legally cognizable interest in the outcome." *Id.* at 1256 (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). And "granting a present determination of the issues offered . . . will have some effect in the real world" because Mr. Baca can receive nominal damages. *Id.* (quotation marks omitted). As a result, this case is not moot and our court has continuing jurisdiction over the issues. Rather, the issue raised by the Department's lack of § 1983 personhood is whether we should exercise our discretion to affirm the district court on this alternative ground, despite the Department's waiver of that argument. We undertake that analysis now.

## V. DISCUSSION PART THREE: FAILURE TO STATE A CLAIM

Having concluded Mr. Baca has standing and that this case is not moot, we proceed to the third part of this opinion: whether the district court's alternative dismissal under rule 12(b)(6) based on failure to state a claim is correct. But, because

we have determined Mr. Baca has standing based only on his removal from office and the nullification of his vote, we limit our analysis to that claim. We begin by setting forth the relevant standard of review. Then, we pause to address whether we should affirm the district court's rule 12(b)(6) dismissal on the alternative ground that the Department is not a person for purposes of § 1983. Finally, because we decline to exercise our discretion to affirm the district court on an alternative ground, we consider whether Mr. Baca has stated a valid claim of deprivation of his constitutional rights.

### A. *Standard of Review*

We review de novo the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 700 (10th Cir. 2014). "To survive a motion to dismiss, a plaintiff must plead facts sufficient to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "[W]e must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Id.* (quotation marks omitted).

### B. *"Person" Under § 1983*

Before we turn to the correctness of the district court's order dismissing Mr. Baca's claim under rule 12(b)(6) for failure to plead a constitutional violation, we must first decide whether to affirm the district court on an alternative nonconstitutional ground—that Mr. Baca's claim fails under rule 12(b)(6) because the Department is not a person under § 1983.

"[I]t is 'a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose the case.'" *Bond v. United States*, 572 U.S. 844, 855 (2014) (quoting *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)). An appeal "brings before this Court not merely the constitutional question decided below, but the entire case," which "includes nonconstitutional questions actually decided by the lower court as well as nonconstitutional grounds presented to, but not passed on, by the lower court." *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7 (1993) (quoting *United States v. Locke*, 471 U.S. 84, 92 (1985)). But an appeal does not bring before the court nonconstitutional grounds never raised. *See id.* at 8. And where "the parties chose to litigate the case on the federal constitutional issues alone," both before the district court and the court of appeals, "the prudential rule of avoiding constitutional questions has no application. The fact that there may be buried in the record a nonconstitutional ground for decision is not by itself enough to invoke this rule." *Id.* at 7–8. *But see United States v. Cusumano*, 83 F.3d 1247, 1251 (10th Cir. 1996) (en banc) (quoting favorably, in dicta, the dissent in *Zobrest*). Although this court has "discretion to affirm on any ground adequately supported by the record," in exercising that discretion we must "consider whether the ground was fully briefed and argued here and below." *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004).

Here, the Department moved to dismiss the Presidential Electors' claims under Federal Rule of Civil Procedure 12(b)(6) based solely on the contention that the Department's actions did not violate Article II or the Twelfth Amendment. And the district court's alternative dismissal under rule 12(b)(6) likewise focused solely on the constitutionality of the Department's actions. Before this court, the Department again focused solely on whether Article II and the Twelfth Amendment were violated by the Department's actions. The Department has never suggested that rule 12(b)(6) dismissal is appropriate because the Department is not a person for purposes of § 1983. To the contrary, the Department made clear in its supplemental briefing that it expressly waives any argument in this case that it is not a person under § 1983.

Based on this procedural history, we decline to affirm the district court's decision on the alternative ground that the Department is not a person under § 1983. The Department has "chose[n] to litigate the case on the federal constitutional issues alone," both before the district court and this court. *Zobrest*, 509 U.S. at 7–8. And although we must raise jurisdictional issues sua sponte, *Koerpel v. Heckler*, 797 F.2d 858, 861 (10th Cir. 1986), there is nothing in § 1983 that "speak[s] in jurisdictional terms or refer[s] in any way to the jurisdiction of the district courts," *Arbaugh*, 546 U.S. at 515 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). "[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional," such as § 1983's limitation to claims against persons, "courts should treat the restriction as nonjurisdictional in character" and address the requirement as "an element of a plaintiff's claim for relief, not a jurisdictional issue." *Id.* at 515–16

(determining Title VII's application to entities with 15 or more employees is nonjurisdictional).[14] And a plaintiff's failure to meet that element is an argument that can be forfeited by a defendant. *See Howlett*, 496 U.S. at 381 ("Respondents also argue in their brief on the merits that a Florida school board is an arm of the State and thus is not a person under § 1983. This contention was not presented in respondent's brief in opposition to the petition for certiorari, and we decline to reach it here."). The Department has expressly waived the failure of this element, and the issue of whether the Department is a person under § 1983 is not a jurisdictional issue that this court must raise sua sponte.[15]

---

[14] The dissent cites *Lexmark International, Inc. v. Static Control Components, Inc.*, for the proposition that we cannot "recognize a cause of action that Congress has denied." 572 U.S. 118, 128 (2014); Dissenting Op. at 4. But *Lexmark*'s statement was in the context of whether a plaintiff had statutory standing to sue—an issue the court must address sua sponte. *See* 572 U.S. at 126–28.

Outside that context, the Court has enforced the waiver of statutory elements. For example, Congress did not create a Title VII cause of action against an employer with fewer than fifteen employees. 42 U.S.C. §§ 2000e(b), 2000e-2(a). But the Supreme Court held in *Arbaugh v. Y&H Corp.* that this limitation was nonjurisdictional and therefore waivable. 546 U.S. 500, 514–15 (2006).

Similarly, Congress did not create a § 1983 action against arms of the states. But this requirement is a nonjurisdictional element of a plaintiff's claim. "Nothing in the text of [§ 1983] indicates that Congress intended courts, on their own motion, to assure that the [personhood] requirement is met." *Id.* at 514.

[15] The Presidential Electors filed a motion with this court seeking leave to conform the Second Amended Complaint to state a claim directly under the Constitution rather than § 1983, if this court determined the failure to meet the "person" element of a § 1983 claim created a jurisdictional barrier. Because we conclude there is no jurisdictional defect, we deny without prejudice the Presidential Electors' motion to conform the Second Amended Complaint as moot.

For these reasons, we decline to affirm the district court's decision to dismiss Mr. Baca's claim under rule 12(b)(6) on the alternative ground that the Department is not a person under § 1983. Instead, we proceed to the issue of whether the district court correctly dismissed Mr. Baca's complaint for failure to allege the deprivation of a constitutional right.

### C. *Constitutional Violation*

Mr. Baca sued under 42 U.S.C. § 1983 for an alleged deprivation of his constitutional rights provided by Article II and the Twelfth Amendment. The district court dismissed his claims because it concluded that § 1-4-304(5) merely "codifies the historical understanding and longstanding practice of binding electors to the People's vote." App. at 93. Mr. Baca challenges this determination, arguing that electors are constitutionally permitted to exercise independence and discretion based on Article II and the Twelfth Amendment, and that Colorado's interference with that power by removing Mr. Baca and nullifying his vote for refusing to comply with the vote-binding provision in § 1-4-304(5) violates his constitutional rights.

In order to determine whether Mr. Baca stated a claim under § 1983, we must first determine whether Article II and the Twelfth Amendment provide Mr. Baca a "right" within the meaning of § 1983. *Dennis v. Higgins*, 498 U.S. 439, 448 (1991). This analysis involves three considerations: (1) "whether the provision in question creates obligations binding on the governmental unit or rather 'does no more than express a congressional preference for certain kinds of treatment,'" (2) whether "[t]he interest the plaintiff asserts [is] 'too vague and amorphous' to be 'beyond the

competence of the judiciary to enforce,'" and (3) "whether the provision in question was 'intend[ed] to benefit' the putative plaintiff." *Id.* at 448–49 (third alteration in original) (quoting *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 106 (1989)).

The parties did not brief to the district court, and the district court did not consider, whether Article II and the Twelfth Amendment provide a "right" within the meaning of § 1983. Nor did the parties adequately raise this issue in their briefing to this court.[16] Instead, the parties focus their argument on the contours of the rights provided to presidential electors and to states under Article II and the Twelfth Amendment and whether the Department's actions violated any rights provided presidential electors. The issue we must address in this case is therefore whether the Department violated any constitutional right Article II and the Twelfth Amendment confer on Mr. Baca based on the delineation of those rights.

To resolve this dispute, we examine the operations of the Electoral College created by the United States Constitution, and particularly the phenomenon known as "faithless" or "anomalous" electors.[17] The precise question before this court is

---

[16] In a footnote in its standing argument, the Department argues that Article II and the Twelfth Amendment are not privately enforceable under § 1983 because "[m]erely exercising a 'federal function' under the cited provisions does not, by itself, confer constitutional rights that may be vindicated in federal court." Dep't's Br. at 30 n.4. This argument is inadequately briefed and therefore waived. *Alder v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

[17] The term "Electoral College" is not used in the Constitution but has come to refer to the presidential electors created by Article II, Section 1. Traditionally,

whether the states may constitutionally remove a presidential elector during voting and nullify his vote based on the elector's failure to comply with state law dictating the candidate for whom the elector must vote.

We begin our analysis by quoting the relevant constitutional text from Article II and the Twelfth Amendment. Then we consider Supreme Court precedent to determine whether the Court has resolved this issue. Concluding it has not, we undertake that task, first identifying the proper framing of the question based on the Supremacy Clause and the Tenth Amendment. Next, we interpret Article II and the Twelfth Amendment, beginning with an analysis of the constitutional text, followed by a discussion of the historical context of the Twelfth Amendment, historical practices of the Electoral College, and authoritative sources.

**1. The Federal Constitution**

The original federal Constitution set forth the method for selecting the President of the United States in Article II, Section 1. At that time, the Constitution provided, in relevant part:

> The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows:
>
> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and

presidential electors who cast a vote contrary to the appointing power's wishes or contrary to the elector's pledge have been referred to as "faithless electors." More recently, some commentators have substituted the term "anomalous electors" to avoid the pejorative connotation implicit in the more traditional phrase. For purposes of this opinion, we use the terms interchangeably.

> Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.
>
> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.
>
> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

U.S. Const., art. II, § 1, cls. 1–4, *amended by* U.S. Const. amend. XII. Under the original version of this section, the electors each voted for two candidates. The person with the most votes became President, while the person with the second-highest number of votes became Vice President. *Id.*

Almost immediately, the practical application of the Electoral College proved disappointing. For example, in 1796, the presidential electors selected Federalist

candidate, John Adams, as President, but paired him with a political rival, Republican Thomas Jefferson, as Vice President. *See Ray*, 343 U.S. at 224 n.11. Then in the election of 1800, two Republicans—Thomas Jefferson and Aaron Burr—each received the same number of electors' votes. 10 *Annals of Cong.* 1024 (1801). This threw the election into the House, where it took over thirty rounds of voting to break the tie. *Id.* at 1028.

These experiences convinced the founders that a change had to be made. In 1804, the Twelfth Amendment to the United States Constitution was ratified. It modified the requirements in Article II, Section 1, Clause 3, and provides:

> The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate; — the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; — The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. [And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in case of the death or other constitutional disability of the President. — The person having the greatest number of votes as Vice-President, shall be the Vice-

> President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

U.S. Const. amend. XII.

With these changes, the electors voted separately for President and Vice President, thereby reducing the risk of a tie or split ticket. Since 1804, there has been a single further amendment to the formation or operation of the Electoral College—the Twenty-Third Amendment provides the District of Columbia with votes in the electoral college, and the District's designated voters are "considered, for the purposes of the election of President and Vice President, to be electors appointed by a State." *Id.* amend. XXIII.

**2. Legal Precedent**

Little case law explores the independence of electors under the Twelfth Amendment or whether electors can be removed for exercising such independence. To the extent the Supreme Court has commented on the question, both the Court and individual Justices have suggested the Constitution—as originally understood—recognized elector independence. *See McPherson v. Blacker*, 146 U.S. 1, 36 (1892) ("Doubtless it was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the chief executive, but experience soon demonstrated that . . . they were so chosen simply to register the will of the appointing power in respect of a particular candidate. In relation, then, to the

independence of the electors, the original expectation may be said to have been frustrated."); *Williams v. Rhodes*, 393 U.S. 23, 43–44 (1968) (Harlan, J., concurring in the result) ("The College was created to permit the most knowledgeable members of the community to choose the executive of a nation whose continental dimensions were thought to preclude an informed choice by the citizenry at large."); *Ray*, 343 U.S. at 232 (Jackson, J., dissenting) ("No one faithful to our history can deny that the plan originally contemplated, what is implicit in its text, that electors would be free agents, to exercise an independent and nonpartisan judgment as to the men best qualified for the Nation's highest offices. Certainly under that plan no state law could control the elector in performance of his federal duty, any more than it could a United States Senator who also is chosen by, and represents, the State.").

The Supreme Court, however, has considered a closely analogous question—whether a primary candidate for party elector can be required to pledge to support the party's candidate. *See Ray*, 343 U.S. at 224. In *Ray*, the Democratic Party challenged the Alabama Supreme Court's determination that requiring a primary candidate for presidential elector to pledge support for the party's candidate violated the Twelfth Amendment. 343 U.S. at 215. In Alabama, political parties were "given the power to fix political or other qualifications for its own members" and could "determine who shall be entitled and qualified to vote in the primary election or to be a candidate therein." *Id.* at 217. The Democratic Party required candidates for presidential elector to take a pledge to support "the nominees of the National Convention of the Democratic Party for President and Vice-President of the United States." *Id.* at 215.

In analyzing whether the Twelfth Amendment prohibited a political party from requiring such a pledge, the Court began by noting the Constitution is silent on the issue:

> [t]he applicable constitutional provisions on their face furnish no definite answer to the query whether a state may permit a party to require party regularity from its primary candidates for national electors. . . . Neither the language of Art. II, [§] 1, nor that of the Twelfth Amendment forbids a party to require from candidates in its primary a pledge of political conformity with the aims of the party. Unless such a requirement is implicit, certainly neither provision of the Constitution requires a state political party, affiliated with a national party through acceptance of the national call to send state delegates to the national convention, to accept persons as candidates who refuse to agree to abide by the party's requirement.

*Id.* at 224–25. The Supreme Court concluded a state political party could require pledges because Alabama's "primary and general elections are a part of the state-controlled elective process." *Id.* at 227. This process was "an exercise of the state's right to appoint electors in such manner, subject to possible constitutional limitations, as it may choose." *Id.* (citing U.S. Const. art. II, § 1). Therefore, "[t]he fact that the primary is part of the election machinery is immaterial unless the requirement of pledge violates some constitutional or statutory provision." *Id.*

The Supreme Court next "consider[ed] the argument that the Twelfth Amendment demands absolute freedom for the elector to vote his own choice, *uninhibited by pledge*." *Id.* at 228 (emphasis added). On this point, the Supreme Court explained:

> It is true that the Amendment says the electors shall vote by ballot. But it is also true that the Amendment *does not prohibit an elector's announcing his choice beforehand, pledging himself*. The suggestion that in the early

> elections candidates for electors—contemporaries of the Founders—would have hesitated, because of constitutional limitations, to pledge themselves to support party nominees in the event of their selection as electors is impossible to accept. *History teaches that the electors were expected to support the party nominees*. Experts in the history of government recognize the *longstanding practice*. Indeed, more than twenty states do not print the names of the candidates for electors on the general election ballot. Instead in one form or another they allow a vote for the presidential candidate of the national conventions to be counted as a vote for his party's nominees for the electoral college. This long-continued *practical interpretation of the constitutional propriety of an implied or oral pledge* of his ballot by a candidate for elector as to his vote in the electoral college weighs heavily in considering the constitutionality of a pledge, such as the one here required, in the primary.

*Id.* at 228–30 (emphases added) (footnotes omitted). From this discussion, it is apparent there is no prohibition on a nominee for elector pledging to vote for a particular candidate, at least with respect to the primary election at issue in *Ray*.

But the Supreme Court went on to state:

> [*E*]*ven if such promises of candidates for the electoral college are legally unenforceable* because violative of an assumed constitutional freedom of the elector under the Constitution, Art. II, [§] 1, to vote as he may choose in the electoral college, it would not follow that the requirement of a pledge *in the primary* is unconstitutional. A candidacy in the primary is a voluntary act of the applicant. He is not barred, discriminatorily, from participating but must comply with the *rules of the party*. Surely one may *voluntarily assume obligations* to vote for a certain candidate. *The State offers him opportunity to become a candidate for elector on his own terms*, although he must file his declaration before the primary.

*Id.* at 230 (emphases added).

Three important aspects of the Court's opinion in *Ray* prevent its holding from controlling the question presented here. First, the Court did not decide whether the pledge in *Ray* could be legally enforced. *Id.* at 230 ("[E]ven if such promises of candidates for the electoral college are legally unenforceable because violative of an

assumed constitutional freedom of the elector under the Constitution . . . to vote as he may choose in the electoral college, it would not follow that the requirement of a pledge in the primary is unconstitutional.”). Here, we cannot leave that question open. Mr. Baca has alleged that § 1-4-304(5) was enforced against him and used to remove him from his role as an elector in violation of the federal Constitution. Therefore, unlike the Court in *Ray*, we must decide whether a requirement to vote for a particular candidate can be legally enforced by removal of the elector and nullification of his vote.

Second, *Ray* notes that an individual could become a candidate for presidential elector, without taking a pledge, through an alternative method allowing independent electors to appear on the ballot. *Id.* at 230. In *Ray*, the decision to enter a party’s primary and “comply with the rules of the party,” including undertaking the pledge, was truly “a voluntary act of the applicant.” *Id.* In contrast, the Colorado statute at issue here, § 1-4-304(5), mandates compliance by every person appointed as an elector. And there is no alternative path by which an elector can appear on the ballot without complying with § 1-4-304(5).

Third, in *Ray*, the Court considered a requirement for the state’s *appointment* of electors; nothing in the opinion speaks to the removal of electors who have begun performing their federal function. The Court recognized that “[a] state’s or a political party’s exclusion of candidates from a party primary because they will not pledge to support the party’s nominees is a method of securing party candidates in the general election, pledged to the philosophy and leadership of that party.” *Id.* at 227. This

action "is an exercise of the state's right to *appoint* electors in such manner, subject to possible constitutional limitations, as it may choose." *Id.* (emphasis added). "Where a state authorizes a party to choose its nominees for elector in a party primary and to fix the qualifications for the candidates," there is no constitutional objection to requiring a pledge in the primary to support the party's nominees. *Id.* at 231.

*Ray*'s holding is narrow. The Court recognized the states' plenary power to determine how electors are appointed. *See* U.S. Const., art. II, § 1, cl. 2; *see also Bush v. Gore*, 531 U.S. 98, 104 (2000). It then held this power can include requiring individuals seeking appointment as electors in a party's primary to take a (potentially unenforceable) pledge to vote for a specific candidate for President or Vice President. *Ray*, 343 U.S. at 227. But *Ray* does not address restrictions placed on electors after appointment or actions taken against faithless electors who have performed their federal function by voting for a different presidential or vice presidential candidate than those they pledged to support. Indeed, *Ray* does not decide whether pledges taken at any stage of the process can be enforced at all, let alone through removal of an elector and nullification of the elector's vote.

Overall, *Ray* is materially distinguishable from the facts here and thus leaves open the relevant enforcement question, even in the context of a state primary election. We turn to that question now, beginning with the relevant standard of review. We then consider Mr. Baca's reliance on the supremacy clause, specifically rejecting the Department's attempt to limit its reach to preemption jurisprudence.

### 3. Framing the Question

As a general rule, we interpret the Constitution according to its text. *See Utah v. Evans,* 536 U.S. 452, 474 (2002) (beginning with a review of the text of the Census Clause before considering its historical application). But when the constitutional question is one "of which the great principles of liberty are not concerned, but [instead raises] the respective powers of those who are equally the representatives of the people," our interpretation "ought to receive a considerable impression from [government] practice." *M'Culloch v. State*, 17 U.S. 316, 401 (1819). When applying constitutional text, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller,* 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

In this appeal, we must interpret Article II and the Twelfth Amendment. But the parties disagree about how to frame the question. Mr. Baca contends we must determine whether "[t]he Constitution's text requires elector discretion." Presidential Electors' Reply at 11. Mr. Baca further contends that the Supremacy Clause prohibits states from interfering with a presidential elector's performance of a federal function. The Department argues instead that we must decide whether there is "any constitutional bar against the States binding their electors to the outcome of the State's popular vote." Dep't's Br. at 54. Pointing to the Tenth Amendment, the Department claims that in the absence of such a bar, the states have the power to bind

or remove electors. And the Department further argues that, even if the Tenth Amendment does not retain for the states the power to remove or bind electors, that power can be found in the express power to appoint electors.

Therefore, we begin our analysis by turning to the Supremacy Clause to place the controversy in context. Then, we shift focus to the Tenth Amendment to determine whether it could reserve to the states the power to bind or remove electors. Concluding that it could not, we next consider whether the Constitution has delegated such power to the states. In answering that question, we reject the Department's argument that the power to appoint electors necessarily includes the power to remove them and to cancel an already-cast vote. We then examine the remaining text of Article II, as modified by the Twelfth Amendment, to decide whether it delegates to the states the power to bind or remove electors. For the reasons we now explain, we conclude that it does not.

a. *Supremacy clause*

"It is a seminal principle of our law 'that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them.'" *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 426 (1819)). "[T]he very essence of supremacy [is] to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments as to exempt its own operation from their own influence." *Id.* (quoting *McCulloch*, 4 Wheat. at 427). To this end, the Supreme Court has held that "the function of a state

Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a *federal function derived from the federal Constitution*; and *it transcends any limitations sought to be imposed by the people of a state*." *Leser v. Garnett*, 258 U.S. 130, 136 (1922) (emphases added); *see also Hawke v. Smith*, 253 U.S. 221, 230–31 (1920) (holding a provision of the Ohio Constitution requiring the submission of proposed constitutional amendments to referendum vote after ratification by the state legislature violated Article V of the United States Constitution). And, relevant here, the Supreme Court has instructed that presidential electors "exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *see also Ray*, 343 U.S. at 224–25 (recognizing "presidential electors exercise a federal function in balloting for President and Vice-President" and they "act by authority of the state that in turn receives its authority from the federal constitution"). As a result, Mr. Baca contends the Department, acting through Secretary Williams, unconstitutionally interfered with his performance of a federal function in his role as presidential elector.[18]

According to the Department, Mr. Baca is asserting classic conflict preemption, which is inapplicable here because § 1-4-304(5) does not conflict with or

[18] "[T]he Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 107 (1989) (footnote omitted). But we turn to the Supremacy Clause to help frame our analysis of the respective rights assigned by the Constitution to presidential electors and the states.

frustrate any federal objectives. Instead, the Department claims the statute furthers congressional objectives, as reflected by Congress's enactment of a similar statute for the District of Columbia's electors, as well as a statute that permits states to make the final determination regarding any controversy or contest regarding the *appointment* of state electors.[19] The Department therefore urges this court to conclude there is no conflict preemption.

The Department's argument misunderstands the scope of the Supremacy Clause. It is true that all types of preemption stem from the Supremacy Clause. *See Colo. Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States*, 693 F.3d 1214, 1222 (10th Cir. 2012) ("In light of the federal Constitution's Supremacy Clause, it has long been recognized that federal law preempts contrary state enactments." (footnote omitted) (internal quotation marks omitted)). But the Supremacy Clause is broader than preemption; it immunizes all federal functions from limitations or control by the states. *Hancock*, 426 U.S. at 178-79; *Leser*, 258 U.S. at 136.

[19] By Constitutional amendment, the District of Columbia is entitled to electors who "shall [be] appoint[ed] in such manner as the Congress may direct," and who "shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a state." U.S. Const. amend. XXIII. The Department points to the statute attempting to bind electors in the District of Columbia to the winner of the popular vote as evidence that it is consistent with Congress's objectives for presidential electors to be subject to vote-binding provisions, and therefore that § 1-4-304(5) does not violate Supremacy Clause principles. But this turns the Supremacy Clause on its head. Congress's power to adopt legislation is cabined by the powers granted in the Constitution, not the converse.

Therefore, in determining whether Mr. Baca has stated a plausible claim for relief based on his removal from his role of elector and the nullification of his vote, we must decide whether the Constitution allows states to take such action against presidential electors exercising their federal function. In undertaking this analysis, we begin with the Tenth Amendment to resolve the parties' arguments regarding how to frame the question: if we ask whether the Constitution *permits* states from removing electors and nullifying nonconforming votes, or if the proper inquiry is whether such activity is *prohibited*.

b. *Tenth Amendment*

The Department argues that, even if the Constitution is silent on the question, "the power to bind or remove electors is properly reserved to the States under the Tenth Amendment." Dep't's Br. at 47–48. The Tenth Amendment states, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Thus, in many instances, silence is properly interpreted as an intent that the relevant power be retained by the states. But that is not true here.

The Supreme Court has instructed that the Tenth Amendment "could only 'reserve' that which existed before." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995). Thus, "the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them. . . . No state can say, that it has reserved, what it never possessed." *Id.* (alteration in original) (quoting 1 Story § 627)). In *U.S. Term*

*Limits*, the Supreme Court held the states had no right to impose additional qualifications on Congressmen, stating, "as the Framers recognized, electing representatives to the National Legislature was a new right, arising from the Constitution itself." *Id.* The Tenth Amendment, therefore, "provides no basis for concluding that the States possess reserved power to add qualifications to those that are fixed in the Constitution." *Id.* Instead, such power "must derive not from the reserved powers of state sovereignty, but rather from the delegated powers of national sovereignty. In the absence of any constitutional delegation to the States of power to add qualifications to those enumerated in the Constitution, such a power does not exist."[20] *Id.*

The same calculus applies to presidential electors. The Tenth Amendment could not "reserve" to the states the power to remove or bind electors because no such power was held by the states before adoption of the federal Constitution. *Id.* at 803–04 ("It is no original prerogative of state power to appoint a representative, a senator, or president for the union.") (quoting 1 Story § 627)). Rather, "the provisions governing elections reveal the Framers' understanding that powers over the election

---

[20] Mr. Baca also argues that requiring electors to vote for the candidate winning the popular vote in the state unconstitutionally adds new requirements for both holding the office of elector and the office of President and Vice President. *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 827 (1995) (concluding states cannot constitutionally add qualifications to serve in Congress beyond those included in the Constitution). Because we conclude the Constitution does not provide the states the power to remove electors on other grounds, we need not decide whether Mr. Baca's removal was also unconstitutional because it was based on an unconstitutional qualification.

of federal officers had to be delegated to, rather than reserved by, the States." *Id.* at 804. The Tenth Amendment thus can provide no basis for removing electors or canceling their votes in the absence of an express delegation in the Constitution of that power. And where the Constitution is silent, there is no "constitutional delegation to the States to [remove electors after they have been appointed or to strike their votes], such a power does not exist." *Id.*

As a result, because the Tenth Amendment could not reserve to the states the power to remove electors or cancel their votes, the states possess such power only if expressly delegated by the Constitution.

**4. Constitutional Text**

Because we conclude the Tenth Amendment could not reserve to the states the power to remove from office and nullify the vote of a presidential elector, we must determine whether the Constitution expressly permits such acts. We begin by addressing the Department's argument that the state's constitutional power to appoint electors includes the power to remove them and to nullify their votes. Determining it does not, we next ascertain whether the remainder of Article II and the Twelfth Amendment delegate the states such power. Again answering that question in the negative, we consider what constitutional rights Article II and the Twelfth Amendment confer on presidential electors.

a. *Appointment power*

Article II provides: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of

Senators and Representatives to which the State may be entitled in the Congress." U.S. Const., art. II, § 1, cl. 2. And the Supreme Court has expressly recognized Article II, Section 1, Clause 2 as one of the clauses constituting an "express delegation[] of power to the States to act with respect to federal elections." *U.S. Term Limits*, 514 U.S. at 805. Relying on cases related to the President's appointment and removal powers, the Department argues this express delegation of power in Article II includes the power to remove electors because "the power to appoint necessarily encompasses the power to remove." Dep't's Br. at 43. Conversely, Mr. Baca contends the President's power to remove subordinate executive officials, although incidental to his appointment power, is inapposite to the removal of presidential electors. We agree with Mr. Baca and conclude the state's appointment power is not so broad as to include the ability to remove electors in punishment for anomalous votes.

To be sure, "the state legislature's power to select the manner for appointing electors is plenary." *Bush*, 531 U.S. at 104; *see also McPherson*, 146 U.S. at 35 ("In short, the appointment and mode of appointment of electors belong exclusively to the states under the constitution of the United States."). The states therefore have broad discretion in the process by which they select their presidential electors. But the question here is not over Colorado's power to appoint electors; it is whether this appointment power includes the ability to remove electors and cancel already-cast votes after the electors are appointed and begin performing their federal function.

In arguing that the power to appoint necessarily includes the power to remove and nullify an anomalous vote, the Department relies on *Myers v. United States*, 272 U.S. 52, 175–76 (1926) (invalidating the Tenure of Office Act of 1867 "in so far as it attempted to prevent the President from removing executive officers who had been appointed by him and with the advice and consent of the Senate"). We read the holding of *Myers* more narrowly than the Department.

True enough, *Myers* acknowledges a principle of "constitutional and statutory construction" that "the power of appointment carrie[s] with it the power of removal." 272 U.S. at 119. But the reasoning supporting this principle illustrates that it extends solely to the executive power. "The reason for the principle is that those in charge of and responsible for administering functions of the government, who select their executive subordinates, need in meeting their responsibility to have the power to remove those whom they appoint." *Id.* These executive officers merely "aid [the President] in the performance of the great duties of his office, and represent him in a thousand acts to which it can hardly be supposed his personal attention is called, and thus he is enabled to fulfill the duty of his great department, express in the phrase that 'he shall take care that the laws be faithfully executed.'" *Id.* at 133 (quoting *Cunningham v. Neagle*, 135 U.S. 1, 63–64 (1890)); *see also* U.S. Const. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America."); U.S. Const. art. II, § 3, cl. 1 ("[The President] shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States"). In the performance of their "highest and most important duties," the

executive officers exercise "not their own but [the President's] discretion," *Myers*, 272 U.S. at 132, and therefore they "must do his will," *id.* at 134.

Because the President must place his "implicit faith" in his subordinates, "[t]he moment that he loses confidence in the intelligence, ability, or loyalty of any one of them, he must have the power to remove him without delay." *Id.* at 134. These "imperative reasons" necessitate the President's "unrestricted power to remove the most important of his subordinates in their most important duties," and consequently "control the interpretation of the Constitution as to all appointed by him." *Id.* at 135. In short, this principle of constitutional construction applies to the executive alone: "when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal." *Id.* at 122; *see also Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935) (recognizing *Myers* "concerned 'an officer [who] is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is'" (quoting *Myers*, 272 U.S. at 163–64). More recently, the Supreme Court confirmed that the executive removal power is based on the broad grant of executive power to the President and the President's constitutional obligation to take care that the laws are faithfully executed. "Since 1789, the Constitution has been understood to empower the President to keep [the executive] officers [who assist the President in discharging his duties] accountable—by removing them from office, if necessary." *Free Enter. Fund*

*v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010). "Article II confers on the President 'the general administrative control of those executing the laws.'" *Id.* at 492 (quoting *Myers*, 272 U.S. at 164)). It is the President's "responsibility to take care that the laws be faithfully executed," and "the President therefore must have some 'power of removing those for whom he cannot continue to be responsible." *Id.* at 493 (quoting *Myers*, 272 U.S. at 117).

These decisions teach that the power to remove subordinates in the executive branch derives from the President's broad executive power and his responsibility to faithfully execute the laws.[21] Unlike the President appointing subordinates in the executive department, states appointing presidential electors are not selecting inferior state officials to assist in carrying out a function for which the state is ultimately responsible. Presidential electors exercise a federal function—not a state function—when casting their ballots. *Burroughs*, 290 U.S. at 545. When undertaking that federal function, presidential electors are not executing their appointing power's

[21] To illustrate this point, we need look no further than the Constitution's delegation of power to the state executive to appoint a replacement to finish the term of a Senator unable to do so. U.S. Const. amend. XVII. ("When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: Provided, That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct."). Under the Department's theory, the power of the state executive to appoint the replacement Senator would include the power to interrupt a session of the United States Senate and demand that a vote cast by the replacement Senator be nullified. We can find nothing in the Constitution that would allow this state intrusion on the operations of the federal government.

function but their own. *Cf. Myers*, 272 U.S. at 132 (recognizing that when executive officers perform their "highest and most important duties[,] . . . they act for" the President and "are exercising not their own but his discretion"). And unlike the Take Care Clause imposed on the President, neither Article II nor the Twelfth Amendment instructs the states to take care that the electors faithfully perform their federal function. From this we conclude that the states' power to appoint electors does not include the power to remove them or to nullify their votes.[22]

b. *Article II and the Twelfth Amendment*

Having determined that neither the Tenth Amendment nor the power to appoint electors provides the states with the power to remove electors and nullify their votes, we turn to the language of Article II, as modified by the Twelfth Amendment.[23] We first analyze the text to determine what role, if any, the states play

---

[22] Even if the power to appoint did include the power to remove, however, that power would not be without limitation. The powers granted to the states by the Constitution "are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams*, 393 U.S. at 29. It cannot "be thought that the power to select electors could be exercised in such a way as to violate express constitutional commands that specifically bar States from passing certain kinds of laws." *Id.* In the same regard, it cannot be thought that the power to remove electors could be exercised in contravention of an express constitutional command.

As we discuss below, the Constitution provides presidential electors with discretion in casting their votes for President and Vice President, and expressly requires that all votes cast for President and Vice President be listed and delivered to the Senate. As a result, a state could not constitutionally exercise any presumed removal power in contravention of these constitutional mandates.

[23] Most of the Department's arguments focus on whether the text of the Twelfth Amendment prohibits, rather than permits, the states' interference with

in the presidential and vice presidential selection process after appointment of the electors. Based on our reading, we conclude the express duties of the states are limited to appointment of the presidential electors. Next, we consider Mr. Baca's argument that the use of the terms "elector," "vote," and "ballot" support a reading of Article II that permits them to vote free from state interference. We agree that contemporaneous usage of these terms supports Mr. Baca's position. Finally, we turn to the historical context of the Twelfth Amendment and its impact on Article II, as originally drafted. Based on our review, we conclude the states may not interfere with a presidential elector who exercises discretion in casting votes for the President and Vice President of the United States.

i. Role of the states after appointment

According to Mr. Baca, the states have no right to remove appointed electors or strike their votes because the Constitution provides no role for the states after appointment. Based on a close reading of the text of the Twelfth Amendment, we agree that the Constitution provides no express role for the states after appointment of its presidential electors.

Article II, as modified by the Twelfth Amendment, describes the process for selecting a President and Vice President in unusual detail, assigning specific duties to

---

electors by binding their votes, removing them from office, or discarding their votes. But, as discussed above, the Tenth Amendment could not reserve to the states any power over the electors. Therefore, the states have power to interfere with electors exercising their federal function only if the Constitution delegates that power to the states.

identified actors. The process begins with the state appointing electors on the date selected by Congress. *See* U.S. Const. art. II, § 1, cls. 2, 4. As discussed, the states have plenary power to decide how those electors are selected. *Id.* art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct . . . ."); *Bush*, 531 U.S. at 104. But the states are not mentioned again in Article II, and the Constitution affords them no other role in the selection of the President and Vice President. Instead, every step thereafter is expressly delegated to a different body.

Article II charges Congress with selecting the date on which the electors will cast their votes. U.S. Const. art. II, § 1, cl. 4. The Twelfth Amendment next provides that the electors shall meet on that day in their respective states to "vote by ballot for President and Vice President." *Id.* amend. XII. The electors then must "name in their [distinct] ballots the person voted for as President[] and . . . Vice-President." *Id.* After the electors cast their ballots, it is the electors who "shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each." *Id.* And the Constitution directs that the electors must "sign and certify" those lists and "transmit" them to the President of the Senate. *Id.*

The Constitution then specifies that the President of the Senate must open the certificates in the presence of the Senate and the House of Representatives and count the votes. *Id.* If an individual receives votes for the office of President or Vice President totaling a majority of the number of appointed electors, that person

becomes President or Vice President elect. *Id.* If no individual achieves a majority, the Twelfth Amendment provides a detailed process by which the House of Representatives chooses the President and the Senate chooses the Vice President. *Id.*

As the text and structure show, the Twelfth Amendment allows no room for the states to interfere with the electors' exercise of their federal functions. From the moment the electors are appointed, the election process proceeds according to detailed instructions set forth in the Constitution itself. The Twelfth Amendment directs the electors to "name in their [distinct] ballots the person voted for as President . . . [and] Vice-President." U.S. Const. amend. XII. And it demands that the lists of votes certified and delivered to the President of the Senate include "all persons voted for as President, and all persons voted for as Vice-President, and the number of votes for each." *Id.* The plain language of the Constitution provides that, once a vote is cast, it must be included in the certified list sent to the President of the Senate. Nowhere in the Twelfth Amendment is there a grant of power to the state to remove an elector who votes in a manner unacceptable to the state or to strike that vote. Indeed, the express requirement that all votes be listed is inconsistent with such power. And because Article II, Section 1, Clause 2 sets the precise number of electors, the state may not appoint additional electors to cast new votes in favor of the candidate preferred by the state.

In short, while the Constitution grants the states plenary power to appoint their electors, it does not provide the states the power to interfere once voting begins, to remove an elector, to direct the other electors to disregard the removed elector's vote,

or to appoint a new elector to cast a replacement vote. *See id.* In the absence of such a delegation, the states lack such power. *U.S. Term Limits*, 514 U.S. at 802 ("[T]he states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them.").

ii. Use of "elector," "vote," and "ballot"

Mr. Baca contends that not only is a role for the state beyond appointment conspicuously absent from the Constitution, but the language used—specifically the terms "elector," "vote," and "ballot"—also establishes that no such role exists because presidential electors are granted the constitutional right to exercise discretion when voting for the President and Vice President. In analyzing this contention, we first consider the meanings of those terms as understood at the time of the Constitution's ratification. Then, we compare the use of "elector" in Article II and the Twelfth Amendment with the use of that term elsewhere in the Constitution.

1) Contemporaneous dictionary definitions

"[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 188

(1824). Therefore, we look to contemporaneous dictionaries to understand the meanings of the words used in the Constitution.[24]

Dictionaries from the relevant period support Mr. Baca's contention that the drafters of the Twelfth Amendment intended electors to exercise discretion in casting their votes for President and Vice President. At the time of the Twelfth Amendment, the term "elector" was defined as "[h]e that has a vote in the choice of any officer," 1 Samuel Johnson, *A Dictionary of the English Language* (London, 6th ed. 1785); "[a] chuser," Nathan Bailey, *A Universal Etymological English Dictionary* (London, 1763); and "[o]ne who chooses, one who has a vote in the choice of any public officer," 1 John Ash, *The New and Complete Dictionary of the English Language* (1795); *see also* Thomas Dyche & William Pardon, *A New General English Dictionary* (11th ed. 1760) (defining elector as "a person who has a right to elect or choose a person into an office"); Noah Webster, *A Compendious Dictionary of the English Language* (1806) (defining elector as "one who elects," and elect as "to choose, select for favor, prefer").

---

[24] For the period of 1750–1800, the following four dictionaries are considered "the most useful and authoritative for the English language": Samuel Johnson, *A Dictionary of the English Language*; Nathan Bailey, *A Universal Etymological English Dictionary*; Thomas Dyche & William Pardon, *A New General English Dictionary*; and John Ash, *The New and Complete Dictionary of the English Language*. Scalia & Garner, Reading Law: The Interpretation of Legal Texts 419 (2012). There are four additional dictionaries deemed the most relevant for the period of 1801–1850—dictionaries from 1806, 1818, 1828, and 1850. *Id.* at 420. Because the Twelfth Amendment was adopted in 1804, the only one of these relevant for our purposes is Noah Webster's 1806 dictionary, *A Compendious Dictionary of the English Language*. *Id.*

Similarly, the term "vote" was defined as "[s]uffrage; voice given and numbered," 2 Samuel Johnson, *A Dictionary of the English Language* (London, 6th ed. 1785); "[v]oice, [a]dvice, or [o]pinion of a [m]atter in [d]ebate," Nathan Bailey, *A Universal Etymological English Dictionary* (London, 1763); "to speak for or in behalf of any person or thing; also to chuse or elect a person into any office, by voting or speaking," Thomas Dyche & William Pardon, *A New General English Dictionary* (11th ed. 1760); "[a] suffrage, a voice given and numbered, a determination of parliament"; "to chuse by suffrage; to give by a vote," 2 John Ash, *The New and Complete Dictionary of the English Language* (1795); "to give or choose by votes," and "a voice," Noah Webster, *A Compendious Dictionary of the English Language* (1806). Correspondingly, "to vote" was defined as "[t]o chuse by suffrage; to determine by suffrage," 2 Samuel Johnson, *A Dictionary of the English Language* (London, 6th ed. 1785), and "to give one's [v]oice," Nathan Bailey, *A Universal Etymological English Dictionary* (London, 1763).[25]

And contemporary sources defined "ballot" as a mechanism for choosing or voting. *See* 1 Samuel Johnson, *A Dictionary of the English Language* (London, 6th ed. 1785) (defining "ballot" as "[a] little ball or ticket used in giving votes, being put

[25] Suffrage was defined as "a [n]ote given at an [e]lection in favour of any [p]erson; [a]pprobation or [a]llowance in general," Nathan Bailey, *A Universal Etymological English Dictionary* (London, 1763), and "[a] vote, a voice given in a controverted point," 2 John Ash, *The New and Complete Dictionary of the English Language* (1795); *see also* 2 Samuel Johnson, *A Dictionary of the English Language* (London, 6th ed. 1785) (defining suffrage as "[v]ote; voice given in a controverted point").

privately into a box or urn"); *id.* (defining "to ballot" as "[t]o choose by ballot, that is, by putting little balls or tickets, with particular marks, privately in a box; by counting which, it is known what is the result of the poll, without any discovery by whom each vote was given"); Nathan Bailey, *A Universal Etymological English Dictionary* (London, 1763) (defining "ballot" as "[a] little ball . . . used in giving of [v]otes"); 1 John Ash, *The New and Complete Dictionary of the English Language* (1795) (defining "ballot" as "[t]o choose by dropping a little ball or ticket into a box; to choose by holding up the hand"); Thomas Dyche & William Pardon, *A New General English Dictionary* (11th ed. 1760) (defining "ballot" as "to vote for, or chuse a person into an office, by means of little balls of several colours, which are put into a box privately, according to the inclination of the chuser or voter"); Noah Webster, *A Compendious Dictionary of the English Language* (1806) (defining "ballot" as "to choose or vote by ballot" and "a little ball, little ticket, chance, lot").[26]

As these sources reflect, the definitions of elector, vote, and ballot have a common theme: they all imply the right to make a choice or voice an individual opinion. We therefore agree with Mr. Baca that the use of these terms supports a determination that the electors, once appointed, are free to vote as they choose.[27]

---

[26] The parties dispute whether the Constitution requires secret ballots. We need not resolve this dispute because the contemporaneous definitions show that ballots indicate a choice, regardless of whether that choice is published to others.

[27] This freedom is not without constitutional limit. The presidential electors are bound by the constitutional directions regarding electors' votes and by who may serve as President or Vice President. *See* U.S. Const. amend. XII (requiring electors

2) Use of "elector" in the Constitution

Mr. Baca also points to the use of the word "elector" elsewhere in the Constitution as support for his position that electors may vote freely. This approach is sound because, "[w]hen seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself." *Ariz. State Legislature*, 135 S. Ct. at 2680 (Roberts, C.J., dissenting); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (recognizing that when a term, such as "the people," is being used as "a term of art employed in select parts of the Constitution," that term should be given the same meaning in each context and contrasted with the use of other terms).

The term "electors" is used in Article I of the federal Constitution. Members of the House of Representatives are "chosen every year by the people of the several states, and the *Electors* in each state shall have the qualifications requisite for *Electors* of the most numerous branch of the state legislature." U.S. Const. art. I, § 2, cl. 1 (emphases added). The term "electors" as used there refers to the citizen voters who choose the persons who will represent them in the House of Representatives. The term "electors" is also used in the Seventeenth Amendment. Although Senators were "chosen by the legislature" of the state at the time of the founding, *id.* art. I, § 3,

---

to vote for at least one candidate not from the elector's state); *id.* art. II, § 1, cl. 5 (mandating the President be a natural born citizen and at least thirty-five years old); *id.* amend. XIV, § 3 (prohibiting anyone from serving as President or Vice President who has taken an oath to support the Constitution and then "engaged in an insurrection or rebellion against the same"); *id.* amend. XXII, § 1 (limiting the President to two terms in office).

cl. 1, the Seventeenth Amendment now requires Senators be "elected by the people" of the state, *id.* amend. XVII. As with the House of Representatives, Senate "*electors* in each state shall have the qualifications requisite for the *electors* of the most numerous branch of the state legislatures." *Id.* (emphases added).

It is beyond dispute that the "electors" under Article I, Section 2, Clause 1, and the Seventeenth Amendment exercise unfettered discretion in casting their vote at the ballot box.[28] It is a "'fundamental principle of our representative democracy,' embodied in the Constitution, that 'the people should choose whom they please to govern them.'" *U.S. Term Limits*, 514 U.S. at 783 (quoting *Powell v. McCormack*,

---

[28] The Supreme Court has upheld laws regulating this right as constitutional under the state's authority to prescribe the time, place, and manner for holding elections for Senators and Representatives, provided by Article I, Section 4, Clause 1, where the laws

> regulated election *procedures* and did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position. They served the state interest in protecting the integrity and regularity of the election process, an interest independent of any attempt to evade the constitutional prohibition against the imposition of additional qualifications for service in Congress. And they did not involve measures that exclude candidates from the ballot without reference to the candidates' support in the electoral process.

*U.S. Term Limits*, 514 U.S. at 835.

The Constitution does not delegate to the states the power to proscribe the time, place, and manner of electors casting their votes for President and Vice President. The Constitution assigns the responsibility of determining the time of voting to Congress, U.S. Const. art. I, § 1, cl. 4, and does not delegate to the states the power to set the place or manner of voting. Thus, the states have less—not more—power under the Twelfth Amendment than they do with respect to regulating the elections of Senators and Congresspersons.

395 U.S. 486, 547 (1969)). "The right to *vote freely for the candidate of one's choice* is of the essence of a democratic society, and the restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (emphasis added). "Not only can th[e] right to vote [provided by Article I, Section 2] not be denied outright, it cannot, consistently with Article I, be destroyed by the alteration of ballots or diluted by stuffing of the ballot box." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (citation omitted).

The freedom of choice we ascribe to congressional electors comports with the contemporaneous dictionary definitions of elector discussed above. And because we treat usage of a term consistently throughout the Constitution, *Verdugo-Urquidez*, 494 U.S. at 265, the use of elector to describe both congressional and presidential electors lends significant support to our conclusion that the text of the Twelfth Amendment does not allow states to remove an elector and strike his vote for failing to honor a pledge to vote for the winner of the popular election. Instead, the Twelfth Amendment provides presidential electors the constitutional right to vote for the candidates of their choice for President and Vice President.

* * *

In summary, the text of the Constitution makes clear that states do not have the constitutional authority to interfere with presidential electors who exercise their constitutional right to vote for the President and Vice President candidates of their choice. The Tenth Amendment could not reserve to the states the power to bind or remove electors, because the electoral college was created by the federal

Constitution. Thus, if any such power exists, it must be delegated to the states by the Constitution. But Article II contains no such delegation. Nor can the states' appointment power be expanded to include the power to remove electors or nullify their votes. Unlike the President's right to remove subordinate officers under his executive power and duty to take care that the laws and Constitution are faithfully executed, the states have no authority over the electors' performance of their federal function to select the President and Vice President of the United States. And a close reading of Article II and the Twelfth Amendment reveals that the states' delegated role is complete upon the appointment of state electors on the day designated by Congress. Once appointed, the Constitution ensures that electors are free to perform that federal function with discretion, as reflected in the Twelfth Amendment's use of the terms "elector," "vote," and "ballot." As we now discuss, this conclusion is further supported by the circumstances surrounding enactment of the Twelfth Amendment, as well as historical practices and sources.

**5. Enactment of the Twelfth Amendment**

The historical impetus for enactment of the Twelfth Amendment provides additional support for our conclusion that presidential electors are free to exercise discretion in casting their votes. As noted, under Article II, Section 1, as originally written, "the electors of each state did not vote separately for President and Vice-President; each elector voted for two persons, without designating which office he wanted each person to fill." *Ray*, 343 U.S. at 224 n.11. Under this system, "[i]f all electors of the predominant party voted for the same two men, the election would

result in a tie, and be thrown into the House, which might or might not be sympathetic to that party." *Id.*

This is exactly what happened in 1800. The electors' vote resulted in seventy-three votes each for Thomas Jefferson and Aaron Burr, sixty-five votes for John Adams, sixty-four votes for Charles Pinckney, and one vote for John Jay. 10 *Annals of Cong.* 1024 (1801). Because two individuals received votes that constitute a majority of the electors appointed, but tied for the number, it was up to the House of Representatives to choose one of the two as President. U.S. Const. art. II, § 1, cl. 3. It took the House thirty-six rounds of voting to select Thomas Jefferson as President. 10 *Annals of Cong.* 1028 (1801).

The 1796 election resulted in a different problem. Federalists urged their electors to support John Adams and Thomas Pinckney, while Anti-Federalists (Democratic-Republicans) urged support for Thomas Jefferson and Aaron Burr. Stephen J. Wayne, *The Road to the White House 2016* 6 (10th ed. 2016). But roughly forty percent of electors ignored this party guidance. John Ferling, *Adams vs. Jefferson: The Tumultuous Election of 1800* 166 (2004). Instead, many Federalist electors, mainly from New England, withheld votes from Thomas Pinckney to ensure that Thomas Pinckney did not receive the same number of votes as John Adams, thereby guaranteeing John Adams the Presidency. Wayne, *supra*, at 6. As a result of this plan, John Adams received seventy-one votes, while Thomas Pinckney received a mere fifty-nine votes. *Id.* But this plan backfired, in part, because Thomas Jefferson received sixty-eight votes, thereby finishing ahead of Thomas Pinckney. *Id.* The 1796

electoral college vote consequently resulted in a President who, although disclaiming political affiliation, strongly favored Federalists, serving with a Vice President who was the leader of the opposing party. *Id.* As the Supreme Court has recognized, this created a "situation [that] was manifestly intolerable." *Ray*, 343 U.S. at 224 n.11.

"The Twelfth Amendment was brought about as the result of the difficulties caused by the procedure set up under [Article] II, [Section] 1." *Id.* These difficulties are highlighted by the split-party presidency resulting from the 1796 election and the thirty-six rounds of voting it took for the House to resolve the 1800 election. But the historical context of the amendment also informs the present question.

Interestingly, the 1796 election produced what is today considered an anomalous vote—Samuel Miles voted for Thomas Jefferson instead of John Adams. *See* Wayne, *supra*, at 6. Samuel Miles led a slate of fifteen Pennsylvania electors running on the Federalist "'Federal and Republican' ticket." Jeffrey L. Pasley, *The First Presidential Contest: 1796 and the Founding of American Democracy* 360–61 (2013). This slate of Federalist electors made one commitment: "approving of George Washington and his policies, the electors would 'be expected to give their suffrages in favor of men who will probably continue the same system of wise and patriotic policy.'" *Id.* They made no specific commitment to John Adams, *id.*, but it was largely understood that John Adams fit this bill, and Thomas Jefferson, a man of "very dissimilar politics" and a "firm Republican," did not. *Id.* at 354.

At the time of the 1796 election, Pennsylvania used a popular vote to select its presidential electors, but state law gave the governor only a short window in which to

certify the winners of the race, even if all votes had yet to be counted. *Id.* at 362–63. By the time that window closed in 1796, thirteen of the fifteen Jefferson electors had received the most votes but, because votes from Greene County had yet to be returned, Samuel Miles and Robert Coleman—two of the electors from the "'Federal and Republican' slate"—had eked out a victory. *Id.* at 363.

Once the Greene County votes were received, it became clear that all fifteen Jefferson electors should have won in Pennsylvania. *Id.* The two excluded Jefferson electors went to Harrisburg and demanded to vote as presidential electors, but they were denied. *Id.* Yet, "[p]ressure ran high for all the electors to fulfill the will of the majority, and . . . Samuel Miles cracked and cast a Jefferson vote." *Id.* This decision brought ire on Samuel Miles, with a critic in a Philadelphia newspaper writing, "What, do I chuse Samuel Miles to determine for me whether John Adams or Thomas Jefferson shall be President? No! I chuse him to act, not to think." Wayne, *supra*, at 6. The essence of the complaint was that Samuel Miles had violated the expectation that he would cast his vote for John Adams. Despite this experience, the Twelfth Amendment did nothing to prevent future faithless votes.

Instead, the Twelfth Amendment changed only the balloting process, allowing electors to designate separately a vote for President and Vice President. *Compare* U.S. Const. art. II, § 1, cl. 3 ("The Electors shall . . . vote by ballot for two persons . . . ."), *with id.* amend. XII ("[The Electors] shall name in their ballots the person voted for as President, and in *distinct* ballots the person voted for as Vice-President . . . ." (emphasis added)). Important for our purposes, the Twelfth

Amendment does not deviate from the original Constitution's use of "elector," "vote," and "ballot." *Compare id.* art. II, § 1, cl. 3 ("The Electors shall meet in their respective states, and vote by ballot for two persons, of whom one at least shall not be an inhabitant of the same state with themselves."), *with id.* amend. XII ("The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves . . . ."). Nor does the Twelfth Amendment contain any language restricting the electors' freedom of choice or delegating the power to impose such restrictions to the states. Thus, the historical context of the Twelfth Amendment supports our textual conclusion that states cannot interfere with the presidential electors' votes and that presidential electors have the constitutional right to exercise discretion when casting those votes.

**6. Historical Practices**

In granting the Department's motion to dismiss under rule 12(b)(6), the district court emphasized the longstanding practice of electors binding themselves to and complying with the will of the people of the state. The Department takes a similar approach on appeal, emphasizing the longstanding practice of electors giving pledges to vote for specific candidates and the use of the short-form ballot which prints the names of the presidential and vice presidential candidates rather than the presidential electors. The Department argues these historical practices support its view that Colorado did not violate the Constitution by removing Mr. Baca. Again, we disagree.

a. *Elector pledges*

It is true that a pledge requirement is consistent with longstanding practices. As the Supreme Court noted in *Ray,* there is a "long-continued practical interpretation of the constitutional propriety of an implied or oral pledge of his ballot by a candidate for elector as to his vote in the electoral college." 343 U.S. at 229–30. And "[h]istory teaches that the electors were expected to support the party nominees." *Id.* at 229. Review of presidential election results also shows that electors usually honor their pledges. Indeed, this consistency led states to omit the names of candidates for elector from the general ballot. *Id.* "Instead in one form or another [the states] allow a vote for the presidential candidate of the national conventions to be counted as a vote for his party's nominees for the electoral college." *Id.*

Although we concur with the Department's review of historical practice, we cannot agree that these practices dictate the result the Department seeks. First, and most importantly, the practices employed—even over a long period—cannot overcome the allocation of power in the Constitution. *McPherson*, 146 U.S. at 35–36. Second, there is an opposing historical practice at play: a history of anomalous votes, all of which have been counted by Congress. As discussed, the first vote cast in defiance of a pledge occurred in 1796—before the Twelfth Amendment was enacted—when Samuel Miles voted for Thomas Jefferson instead of John Adams, much to the displeasure of his Federalist contemporaries. But Elector Miles's vote for Thomas Jefferson was listed and delivered to the Senate, where it was counted. 6 *Annals of Cong.* 2096 (1797); FairVote, *Faithless Electors*,

https://www.fairvote.org/faithless_electors (last visited Jan. 10, 2019). Since that first faithless vote, there have been approximately 166 additional anomalous votes listed, certified, delivered, and counted. FairVote, *Faithless Electors*, https://www.fairvote.org/faithless_electors (last visited Jan. 10, 2019).[29]

Indeed, we are aware of no instance in which Congress has failed to count an anomalous vote, or in which a state—before Colorado—has attempted to remove an elector in the process of voting, or to nullify a faithless vote. And on only one occasion has Congress even debated whether an anomalous vote should be counted. In 1969, six Senators and thirty-seven Representatives objected to counting a vote from North Carolina because the elector voted for George Wallace for President and Curtis LeMay for Vice President, despite Richard Nixon and Spiro Agnew winning the popular vote in North Carolina. 115 Cong. Rec. 146 (1969). After significant debate, the House voted to reject the objection (and count the elector's votes) by a margin of 228–170, *id.* at 170, and the Senate voted to reject the objection, by a count of 58-33, *id.* at 246.

---

[29] FairVote does not list Mr. Nemanich as one of these anomalous votes. FairVote, *Faithless Electors*, https://www.fairvote.org/faithless_electors (last visited Jan. 10, 2019). But, according to the Second Amended Complaint, after becoming an elector, Mr. Nemanich executed a pledge to vote for Bernie Sanders for President. Mr. Nemanich was later required by the Department to take an oath stating that he would vote for Hillary Clinton. Although Mr. Nemanich complied with that later oath and voted for Hillary Clinton, he violated his initial pledge to vote for Bernie Sanders.

In the most recent 2016 election, Congress counted thirteen anomalous votes from three states. Specifically, Congress counted presidential votes for Colin Powell (three from Washington),[30] John Kasich (one from Texas), Ron Paul (one from Texas), Bernie Sanders (one from Hawaii), and Faith Spotted Eagle (one from Washington); and vice presidential votes for Elizabeth Warren (one from Hawaii and one from Washington), Maria Cantwell (one from Washington), Susan Collins (one from Washington), Carly Fiorina (one from Texas), and Winona LaDuke (one from Washington). 163 Cong. Rec. H189 (daily ed. Jan. 6, 2017). By counting those votes, Congress acted consistently with the treatment of every anomalous vote cast since the creation of the electoral college.

This uninterrupted history of Congress counting every anomalous vote cast by an elector weighs against a conclusion that historical practices allow states to enforce elector pledges by removing faithless electors from office and nullifying their votes.

b. *Short-form ballots*

The Department next points to the states' historical practice of using short-form ballots as "incompatible with electors exercising independent discretion" because "[v]oters have no basis for judging the prospective electors' qualifications or

---

[30] The Washington Supreme Court recently upheld the imposition of fines against these faithless electors. *In re Guerra,* No. 95347-3, 2019 WL 2220430, at **2, 8 (Wash. May 23, 2019). Although we do not embrace the analysis of the majority opinion in *In re Guerra*, we also note that the issue before the Washington Supreme Court is materially different than the question presented here: Whether after voting in the electoral college has begun, the state may remove an elector and nullify his vote.

trustworthiness, let alone uncovering their identities," and "[a] voter . . . understandably believes that he or she is casting [his or her] ballot for actual presidential and vice-presidential candidates." Dep't's Br. at 59. The Department's position can be rephrased as a contention that because states have chosen, over time, to use a short-form ballot, thereby allowing voters to believe they are voting directly for presidential and vice presidential candidates, electors are now bound to make that misperception true. The Supreme Court has foreclosed such a conclusion.

In *McPherson*, the Supreme Court considered a challenge to Michigan's statute allowing for its presidential electors to be appointed by state districts. 146 U.S. at 24–25. In upholding the law, the Court relied on the plenary power granted in the Constitution "to the state legislatures in the matter of the appointment of electors." *Id.* at 35. The Court recognized that after the Constitution was ratified, states employed "various modes of choosing the electors," such as "by the legislature itself on joint ballot; by the legislature through a concurrent vote of the two houses; by a vote of the people of a general ticket; . . . and in other ways." *Id.* at 29. But it also acknowledged that "public opinion had gradually brought all states . . . to the pursuit of a uniform system of popular election by general ticket." *Id.* at 36. Despite the shift to a uniform method of appointment, the Court upheld Michigan's departure from that practice. The Court explained that the question was "not one of policy, but of power." *Id.* at 35. And because "[t]he prescription of the written law cannot be overthrown because the states have laterally exercised, in a particular way, a power which they might have exercised in some other way," *id.* at 36, the Court enforced

the plenary power granted by the Constitution for the state to appoint its electors in "such Manner as the Legislature thereof may direct," U.S. Const., art. II, § 1, cl. 2.

The Court also rejected an argument that the states' method of choosing electors by district would not have been constitutionally objectionable "if the operation of the electoral system had conformed to its original object and purpose," but that it "had become so in view of the practical working of that system." *McPherson*, 146 U.S. at 36. The Court concluded that the district method of choosing electors could not somehow become unconstitutional simply because presidential electors now conformed to the will of the states to register their votes consistently with the results of the state's general election:

> *Doubtless it was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the chief executive*, but experience soon demonstrated that, whether chosen by the legislatures or by popular suffrage on general ticket or in districts, they were so *chosen simply to register the will of the appointing power in respect of a particular candidate*. In relation, then, to the independence of the electors, the original expectation may be said to have been frustrated. But we can *perceive no reason for holding that the power confided to the states by the constitution has ceased to exist because the operation of the system has not fully realized the hopes of those by whom it was created.* Still less can we recognize the doctrine that because the constitution has been found in the march of time sufficiently comprehensive to be applicable to conditions not within the minds of its framers, and not arising in their time, *it may therefore be wrenched from the subjects expressly embraced within it, and amended by judicial decision without action by the designated organs in the mode by which alone amendments can be made*.

*Id.* (citations omitted) (emphases added). That is, the Court refused to depart from the language of the Constitution in the absence of a constitutional amendment codifying modern practices.

Over a century later, the Court reaffirmed the decision in *McPherson* and emphasized that "[t]he individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college." *Bush*, 531 U.S. at 104. And while "[h]istory has now favored the voter, and in each of the several States the citizens themselves vote for Presidential electors," the State, "after granting the franchise in the special context of Article II, can take back the power to appoint electors." *Id. Bush*, like *McPherson*, instructs that even long-practiced policies cannot limit the power granted by the Constitution.

The same analysis is true in this case. "The question before us is not one of policy, but of power . . . ." *McPherson*, 146 U.S. at 35. "The prescription of the written law cannot be overthrown because the [electors] have laterally exercised, in a particular way, a power which they might have exercised in some other way." *Id.* at 36. Although most electors honor their pledges to vote for the winner of the popular election, that policy has not forfeited the power of electors generally to exercise discretion in voting for President and Vice President.[31] Rather, as historical practice

[31] The cases the district court and the Department rely upon that determined electors do not have independence (although not in the context of a constitutional challenge to restrictions) have all fallen within this same trap. *See Spreckles v. Graham*, 228 P. 1040, 1045 (Cal. 1924) ("It was originally supposed by the framers of our national Constitution that the electors would exercise an independent choice, based upon their individual judgment. But, in practice so long established as to be recognized as part of our unwritten law, they have been 'selected under *a moral*

shows, electors have strayed from their pledges throughout history and Congress has unfailingly counted those anomalous votes.

For the foregoing reasons, historical practice of using short-form ballots and of most electors complying with their pledges do not undermine our conclusion that the state could not constitutionally remove Mr. Baca or strike his vote for refusing to comply with the demands of § 1-4-304(5).

**7. Authoritative Sources**

The parties also rely on authoritative sources for their respective interpretations of Article II and the Twelfth Amendment, including the Federalist Papers and Justice Story's Commentaries on the Constitution. As we now explain, these sources buttress our conclusion that the Constitution prohibits the state from removing presidential electors performing their federal function, even where the electors vote contrary to a state-imposed requirement.

---

*restraint* to vote for some particular person who represented the preferences of the appointing power.'" (emphasis added) (citation omitted)); *Thomas v. Cohen*, 262 N.Y.S. 320, 323–24 (N.Y. Sup. Ct. 1933) ("Does the United States Constitution require [electors] to vote as directed by the voters of their state? Confining yourself to the exact language to the instrument brings a negative answer to that question. We must inquire, however, if anything has happened since those constitutional provisions were written which might alter the apparent meaning.").

In the Federalist Papers,[32] Alexander Hamilton explained the reasons for adopting the electoral college as the method for selecting the United States President:

> It was desirable, that the sense of the people should operate in the choice of the person to whom so important a trust [the presidency] was to be confided.[[33]] *This end will be answered by committing the right of making it, not to any preestablished body, but to men chosen by the people for the special purpose, and at the particular conjuncture.*
>
> It was equally desirable, that the immediate election should be made by *men most capable of analyzing the qualities adapted to the station*, and acting under *circumstances favourable to deliberation*, and to a *judicious combination of all the reasons and inducements that were proper to govern their choice*. A small number of persons, selected by their fellow citizens from the general mass, will be most likely to possess the *information and discernment requisite to so complicated an investigation*.

The Federalist No. 68 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) (emphases added).

Federalist 68 also recognizes the desire that "every practicable obstacle should be opposed to cabal, intrigue, and corruption." *Id.* "These most deadly adversaries of the republican government" would be "expected to make their approaches . . . chiefly from the desire in foreign powers to gain an improper ascendant in our councils." *Id.*

---

[32] The Federalist Papers are a collection of essays written by Alexander Hamilton, John Jay, and James Madison in support of ratification of the federal Constitution.

[33] The Department attempts to use this first sentence to say that "Hamilton himself expressed contradictory positions on whether electors were to exercise discretion." Dep't's Br. at 55–56. Federalist 68 cannot be read fairly to support this interpretation. When this sentence is put into context with the rest of the paragraph, Alexander Hamilton's view that electors were selected to make an informed choice in selecting the President is apparent.

But the electoral college "guarded against all danger of this sort," by "not ma[king] the appointment of the president to depend on preexisting bodies of men, who might be tampered with beforehand to prostitute their votes," and instead referring that decision "in the first instance to an immediate act of the people of America, to be exerted in the *choice of persons for the temporary and sole purpose of making the appointment.*" *Id.* (emphasis added). Further the Constitution "excluded from eligibility to this trust [of serving as an elector], all those who from situation might be suspected of too great devotion to the president in office," by prohibiting senators, representatives, and others holding a place of trust or profit under the United States from serving in the elector role. *Id.* As a result, "the immediate agents in the election will at least enter upon the task free from any sinister bias. Their *transient existence*, and their *detached situation*, already noticed, afford a satisfactory prospect of their continuing so, to the conclusion of it." *Id.* (emphases added). Moreover, the President will be "independent for his continuance in office, on all but the people themselves," because the President's re-election "depend[s] on a special body of representatives, *deputed by the society for the single purpose of making the important choice.*" *Id.* (emphasis added).

There can be little doubt in reading Federalist 68 that Alexander Hamilton understood the Constitution to entrust the selection of the President to "a small number of persons" selected for their ability to "analyz[e] the qualities adapted to the station" of President. *Id.* These electors were to act "under circumstances favorable to deliberation" and to judiciously consider "all the reasons and inducements that were

proper to govern their choice." *Id.* The electors were to be selected based on their possession of the "information and discernment requisite to so complicated an investigation." *Id.* And the appointment of President was "to be exerted in the choice of persons for the temporary and sole purpose of making the appointment." *Id.* Simply put, Federalist 68 cannot be read to require the electors to vote according to the dictates of a "preestablished body." *Id.* Instead, Federalist 68 makes clear the decision was to be made by electors with a "transient existence" and a "detached situation," to guard against the appointment being made by "bodies of men, who might be tampered with beforehand to prostitute their votes." *Id.*

This reading of Federalist 68 is consistent with Hamilton's discussion of the "dissimilar modes of constituting the several component parts of the government." The Federalist No. 60 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001). In Federalist 60, Hamilton explains that "[t]he house of representatives being to be elected immediately by the people; the senate by the state legislatures; the President by electors chosen for that purpose by the people; there would be little probability of a common interest to cement these different branches in a predilection for any particular class of electors." *Id.* Although at that time the Senate was selected by the "state legislatures," Hamilton noted that the method for selecting the President was different—"by electors chosen for that purpose by the people." *Id.* It is obvious from Federalist 60 that Alexander Hamilton did not anticipate that state legislatures would elect the President by bound proxies.

John Jay expressed a similar view that "the president [is] to be chosen by select bodies of electors, to be deputed by the people for that express purpose." The Federalist No. 64 (John Jay) (George W. Carey & James McClellan eds., 2001). "As the select assemblies for choosing the president . . . will, in general, be composed of the most enlightened and respectable citizens, there is reason to presume, that their attention and their votes be directed to those men only who have become the most distinguished by their abilities and virtue, and in whom the people perceive just grounds for confidence." *Id.* As with the view expressed by Hamilton in Federalist 68, Jay's discussion in Federalist 64 is consistent with "enlightened and respectable" electors expected to direct their votes to the most distinguished and worthy candidates for President.

In short, the Federalist Papers are inconsistent with the Department's argument that the electors are mere functionaries who can vote only for the candidate dictated by the state. Instead, these contemporaneous interpretations of the federal Constitution support the conclusion that the presidential electors were to vote according to their best judgment and discernment.

Contrary to the Department's characterization, Justice Story expressed similar views in his Commentaries on the Constitution:[34]

---

[34] Although Justice Story wrote almost thirty years after adoption of the Twelfth Amendment, his Commentaries on the United States Constitution have been relied on by the Supreme Court as informative on issues of constitutional interpretation. *See, e.g.*, *District of Columbia v. Heller,* 554 U.S. 570, 607 (2008) (Second Amendment); *Clinton v. Jones,* 520 U.S. 681, 714 (1997) (Presidential immunity); *U.S. Term Limits*, 514 U.S. at 799 (Article I).

> It has been observed with much point, that in no respect have the enlarged and liberal *views of the framers of the constitution, and the expectations of the public, when it was adopted, been so completely frustrated, as in the practical operation of the system, so far as relates to the independence of the electors in the electoral colleges*. It is notorious, that the electors are now chosen wholly with reference to particular candidates, and are silently pledged to vote for them. Nay, upon some occasions the electors publicly pledge themselves to vote for a particular person; and thus, in effect, the whole foundation of the system, so elaborately constructed, is subverted. The candidates for the presidency are selected and announced in each state long before the election; and an ardent canvass is maintained in the newspapers, in party meetings, and in the state legislatures, to secure votes for the favourite candidate, and to defeat his opponents. Nay, the state legislatures often become the nominating body, acting in their official capacities, and recommending by solemn resolves their own candidate to the other states. So, that nothing is left to the electors after their choice, but to register votes, which are already pledged; and an exercise of an independent judgment would be treated, as a political usurpation, dishonourable to the individual, and a fraud upon his constituents.

3 Joseph L. Story, Commentaries on the Constitution of the United States § 1457 (1833) (emphases added) (footnote omitted).

The Department relies on this Commentary to argue that presidential electors acting independently would be a "political usurpation" and a "fraud upon [their] constituents." Dep't's Br. at 58. But this interpretation does not withstand careful scrutiny. Justice Story begins his commentary with the recognition that the framers *and the public* expected electors to act independently at the time the Constitution was adopted. He then acknowledges that this expectation has been frustrated by "the *practical operation* of the system." 3 Story § 1457 (emphasis added). But nothing in the commentaries suggests Justice Story approves of the practice or that such practices could constrict the power granted by the Constitution. Rather than

applauding the system of public and private pledges that had become common, Justice Story criticized it as frustrating the expectations of the framers and the public. And, as discussed, "[t]he question before us is not one of policy, but of power." *McPherson*, 146 U.S. at 35. "The prescription of the written law cannot be overthrown because the [electors] have laterally exercised, in a particular way, a power which they might have exercised in some other way." *Id.* at 36. Thus, while Justice Story's Commentaries acknowledge the prevalence of pledges, they also affirm our interpretation of the constitutional text.

Mr. Baca and the amicus briefs filed in support of his position also cite numerous contemporaneous statements showing that the framers and early Congressmen (including those involved in passing the Twelfth Amendment) believed presidential electors were to act with discretion. In response, the Department alleges that "[t]he historical record . . . reveals, at best, an inconsistent and largely conflicting paper trail of opinions by the Framers regarding the electors' proper roles." Dep't's Br. at 56. But the Department has failed to point to any contemporaneous source that contradicts an understanding of elector discretion—except the inaccurate portrayals of Federalist Number 68 and Justice Story's Commentaries we reject above. Instead, the Department relies on modern sources for its proposition. While it is true that the states now almost uniformly require electors to pledge their votes to the winners of the popular election, that does not speak to the

states' ability to enforce those pledges after voting has begun by removing the elector and nullifying his vote.[35]

Contemporaneous authoritative sources—mainly in the form of the Federalist Papers and Justice Story's Commentaries—support our reading of the Constitution as providing the electors the discretion to vote for the presidential candidate of their choice. They therefore support our conclusion that the Constitution does not grant to the states the power to remove electors who vote independently, despite the electors' pledge to cast their votes for the winners of the popular election. Because voting as an elector is a federal function, *Burroughs*, 290 U.S. at 544, similar to the "function of a state Legislature in ratifying a proposed amendment to the federal Constitution, . . . it transcends any limitations sought to be imposed by the people of a state." *Leser*, 258 U.S. at 137.

* * *

Article II and the Twelfth Amendment provide presidential electors the right to cast a vote for President and Vice President with discretion.[36] And the state does not possess countervailing authority to remove an elector and to cancel his vote in

---

[35] The Department also relies on arguments that several of the founding fathers "advocated for direct popular election of the President." Dep't's Br. at 55. But, as is obvious from the text of Article II and the Twelfth Amendment, that position did not prevail. *See* U.S. Const. amend. XII.

[36] "After pinpointing [the specific constitutional right at issue], courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017). The parties have not addressed this issue in their briefs, and we leave it to the district court to resolve the unaddressed aspects of Mr. Baca's claim on remand.

response to the exercise of that Constitutional right. The electoral college did not exist before ratification of the federal Constitution, and thus the states could reserve no rights related to it under the Tenth Amendment. Rather, the states possess only the rights expressly delegated to them in Article II and the Twelfth Amendment. Those constitutional provisions grant states the plenary power to appoint its electors. But once that appointment process is concluded, the Constitution identifies no further involvement by the states in the selection of the President and Vice President. And the states' power to appoint, without any duty to take care that the electors perform their federal function faithfully, does not include the power to remove. The Constitution provides a detailed list of procedures that must be performed by specific actors—not including the states—after appointment. The electors must list all votes cast for President and Vice President, certify that list, and send it to the President of the Senate. Even where an elector violates a state-required pledge to vote for the winners of the state popular election, there is nothing in the federal Constitution that allows the state to remove that elector or to nullify his votes. And in the absence of such express authority, the states may not interfere with the electors' exercise of discretion in voting for President and Vice President by removing the elector and nullifying his vote. Neither historical practices nor authoritative sources alter our conclusion.

Secretary Williams impermissibly interfered with Mr. Baca's exercise of his right to vote as a presidential elector. Specifically, Secretary Williams acted unconstitutionally by removing Mr. Baca and nullifying his vote for failing to comply

with the vote binding provision in § 1-4-304(5). Mr. Baca has therefore stated a claim for relief on the merits, entitling him to nominal damages.

## VI. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Ms. Baca's and Mr. Nemanich's claims under rule 12(b)(1) for lack of standing. But we **REVERSE** the district court's dismissal of Mr. Baca's claim under both rule 12(b)(1) and rule 12(b)(6). Therefore, we **REMAND** to the district court for further proceedings consistent with this opinion.

No. 18-1173, *Baca v. Colorado Department of State*
**BRISCOE**, Circuit Judge, dissenting.

While the majority has presented a thorough analysis in support of its ruling, I would not reach the merits of the issues presented but would instead conclude that this case is moot.[1] The Presidential Electors sued the Department under 42 U.S.C. § 1983. App. at 17–19. They seek nominal damages, a declaration that Colorado Revised Statute § 1-4-304(5) is unconstitutional, and a finding that their constitutional rights were violated. *Id.* at 19. As the majority explains, the Presidential Electors lack standing to pursue prospective relief. *See* Maj. Op. at 22–24. But an award of damages is retrospective relief, and "we consider declaratory relief retrospective to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred." *PeTA v. Rasmussen*, 298 F.3d 1198, 1202–03 & n.2 (10th Cir. 2002). Therefore, the question is whether the retrospective relief sought can sustain this case. I would conclude that it cannot because "a State is not a 'person' against whom a § 1983 claim for monetary damages might be asserted."[2] *Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002).

---

[1] "We can raise issues of standing and mootness *sua sponte* because we 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'" *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)). As discussed in the majority opinion, we requested supplemental briefing on mootness. Maj. Op. at 8.

[2] Without an award of nominal damages, a retrospective declaration that the Presidential Electors' rights were violated "would amount to nothing more than a declaration that [they] w[ere] wronged." *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997). "[I]n the context of an action for declaratory relief, a plaintiff must be

"Under settled law, we may dismiss th[is] case [as moot] . . . only if 'it is impossible for a court to grant any effectual relief whatever' to [the Presidential Electors] assuming [they] prevail[]." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). "[A] claim for money damages . . . . , if at all plausible, ensure[s] a live controversy." *Id.* "If there is any chance of money changing hands, [the] suit remains live." *Id.*

No such chance exists. Section "1983 creates no remedy against a State." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ("[A] State is not a person within the meaning of § 1983."). By suing the Department, the Presidential Electors have sued the state of Colorado. *Ross v. Bd. of Regents*, 599 F.3d 1114, 1117 (10th Cir. 2010) (explaining that state agencies, as arms of the state, are not persons under § 1983). Therefore, § 1983 affords the Presidential Electors "no remedy against" the Department. *Arizonans*, 520 U.S. at 69.

Absent a plausible claim for nominal damages, this case is moot. *Id.* (claim for nominal damages in § 1983 suit against state was not "sufficient to overcome mootness [because the claim] was nonexistent"); *Lankford v. City of Hobart*, 73 F.3d 283, 288 (10th Cir. 1996) ("[T]he lack of an appropriate remedy moots [the plaintiffs'] claims for relief[ under Title VII]. . . . [B]ecause no legal remedies are available to plaintiffs a

---

seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011). Therefore, whether this case is moot depends on whether the Presidential Electors can plausibly recover nominal damages.

verdict in their favor would do little more than provide them with emotional satisfaction.”).[3] Because we can grant no relief, this case presents “an abstract dispute about the law, unlikely to affect these plaintiffs any more than it affects other . . . citizens. And a dispute solely about the meaning of a law . . . falls outside the scope of the

[3] The majority concludes that “we may not consider the merits of the personhood argument because the mootness inquiry ‘in no way depends on the merits of the plaintiff’s contention.’” Maj. Op. at 51 (quoting *Keller Tank Servs. II, Inc. v. Comm’r*, 854 F.3d 1178, 1194 (10th Cir. 2017)). At the pleading stage, a plaintiff must invoke our power to adjudicate a case by sufficiently alleging the prerequisites to subject-matter jurisdiction. *See Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015) (“[A plaintiff] fail[s] to raise a substantial federal question for jurisdictional purposes [when his claim is] . . . ‘wholly insubstantial and frivolous.’” (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 8–9 (1978) (implying that a “claim for damages [that] . . . is . . . so insubstantial or so clearly foreclosed by prior decisions” would not “save[ a] ca[se] from the bar of mootness”). Because the Presidential Electors have sued the Department under § 1983, the availability of nominal damages is clearly foreclosed by *Lapides*, *Arizonans*, and *Will*. It is therefore appropriate to consider the “personhood argument” in relation to mootness. *See Arizonans*, 520 U.S. at 69; *Memphis Light*, 436 U.S. at 8–9.

Other courts have similarly concluded that a futile claim for damages cannot sustain an otherwise moot case. *Int’l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 237 (4th Cir. 2018) (claim for damages did not prevent mootness because there was no “possibility of damages”); *Tanner Advert. Grp. v. Fayette Cty.*, 451 F.3d 777, 786 (11th Cir. 2006) (en banc) (“A request for damages that is barred as a matter of law cannot save a case from mootness.”); *Johnson v. City of Shorewood*, 360 F.3d 810, 816 (8th Cir. 2004) (reasoning that a “claim would be moot because [a court] could not grant the relief the [plaintiffs] s[ought]”); *Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 691 (6th Cir. 2002) (“[A] key question [in the mootness inquiry] . . . is whether [the plaintiff] has a *viable* claim for damages.”); *see also Nat’l Iranian Oil Co. v. Mapco Int’l, Inc.*, 983 F.2d 485, 490 (3d Cir. 1992) (“A claim for money damages is moot only if it will never be possible for the defendant to provide any relief.”); 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533.3 (3d ed. 2019) (“[I]f other relief is sought and has become moot, it is appropriate to dismiss the action as moot, without deciding the merits of the claimed wrong, if damages are not legally available for that wrong or the defendant is immune.”).

constitutional words 'Cases' and 'Controversies.'" *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).

It makes no difference that the Department has waived Eleventh Amendment sovereign immunity. Supp. App. at 116. "The barrier [to recovering nominal damages i]s not . . . Eleventh Amendment immunity, which the State could waive. The stopper [i]s that § 1983 creates no remedy against a State." *Arizonans*, 520 U.S. at 69; *see also Will*, 491 U.S. at 85 (Brennan, J., dissenting) ("If states are not 'persons' within the meaning of § 1983, then they may not be sued under that statute regardless of whether they have consented to suit.").

Nor can the Department save this case from mootness by waiving "the argument that it is not a 'person' under § 1983." Supp. Br. at 1; *see Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1164 (10th Cir. 2004) ("[I]t is well established that the parties may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy.'" (quotation marks omitted)). The majority concludes that "Mr. Baca may prevail on his claim and be entitled to nominal damages" because "the Department . . . has expressly waived the argument that it is not a person under § 1983."[4] Maj. Op. at 49–50. We may not

[4] I would not entertain the parties' attempt to rewrite the Presidential Electors' pleadings on the fly. The parties urge us to overlook the Presidential Electors' deficient pleadings because "any alleged defect is a technicality in the purest sense: it does not affect, in any way, the substantive ability of [the Presidential Electors] to bring an identical legal claim . . . . against the former Secretary in his individual capacity." Supp. Br. at 17. In the parties' eyes, "[s]uch a case would be, in every respect, identical to that here." *Id.* A claim against the former Secretary in his individual capacity is not identical to a claim against the Department; they are different defendants. The Secretary, sued in

"recognize a cause of action that Congress has denied." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will*, 491 U.S. at 66. The parties cannot "circumvent congressional intent by" agreeing to waive an element of the Presidential Electors' § 1983 claim. *See id.* at 71. Moreover, we are not bound to follow "a rule of law whose nonexistence is apparent on the face of things, simply because the parties agree upon it." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quotation marks omitted); *see also O'Connor v. City & Cty. of Denver*, 894 F.2d 1210, 1226 (10th Cir. 1990) ("[A] party may not compel a court to decide a constitutional argument, especially one of some difficulty, by stipulation." (quotation marks omitted)).

The majority distinguishes this case from *Arizonans* by explaining that, in *Arizonans*, "it was not the failure of the improvised nominal-damages claim under § 1983 that mooted the case; it was [the plaintiff]'s departure from state employment." Maj. Op. at 47. I understand the holding in *Arizonans* to turn on whether the plaintiff could obtain prospective or retrospective relief. Even without the claim for prospective relief (which

---

his individual capacity, is a person. The Department is an arm of the state of Colorado. Only one can be sued under § 1983. *Will*, 491 U.S. at 64. The Presidential Electors initially sued the former Secretary in his individual capacity. *See* Dist. Ct. Dkt. No. 30 at 1. But then the parties agreed to amend the pleadings by substituting the Department for the former Secretary. *Id.* The parties intended to "streamlin[e] this case and postur[e] their claims and defenses in a way that w[ould] lead to a ruling that provides guidance for the 2020 presidential election." *Id.* At that time, the parties understood that they had "restructure[ed] the case in a significant way." *Id.*

was unavailable because the plaintiff no longer worked for the state), the case would not have been moot if the plaintiff could obtain nominal damages. *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004). But the plaintiff's claim for nominal damages was futile because the defendant was a state. *Arizonans*, 520 U.S. at 69. Therefore, neither prospective nor retrospective relief was available. *Id.* at 68–71. As in *Arizonans*, the Presidential Electors cannot obtain a prospective declaratory judgment. All that is left is their claim for nominal damages and the attendant retrospective declaratory relief. Because the Presidential Electors have sued a state, their claim for nominal damages is futile. *See id.* at 69. Therefore, the outcome here should be the same as in *Arizonans*.

The majority also concludes that "*Arizonans* does not teach that any claim for damages against a state pursuant to § 1983 is moot; it stands for the narrower proposition that a last-minute claim for legally unavailable relief cannot overcome certain mootness." Maj. Op. at 48. I disagree. *Arizonans* did more than discuss the timeliness of the nominal damages claim. 520 U.S. at 68, 71. Before encouraging "close inspection" of "a claim for nominal damages, extracted late in the day . . . and asserted solely to avoid otherwise certain mootness," *id.* at 71, the Court explained that "§ 1983 creates no remedy against a State," *id.* at 69. The Court's discussion of whether "§ 1983 actions . . . lie against a State" would be unnecessary if *Arizonans* was only a case about when a plaintiff has delayed too long in raising a claim for nominal damages "to overcome mootness." *Id.* Nor do I think the timeliness is the most relevant consideration; a futile

claim for damages prevents us from granting relief regardless of when the claim was raised by a plaintiff.

Because we cannot grant relief to the Presidential Electors, I would dismiss the appeal as moot.